# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE FREDERICK HSU LIVING TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12108-VCL |
| | ) | |
| ODN HOLDING CORPORATION, OAK HILL CAPITAL PARTNERS III, L.P., OAK HILL CAPITAL MANAGEMENT PARTNERS III, L.P., OHCP GENPAR III, L.P., OHCP MGP PARTNERS III, L.P., OHCP MGP III, LTD., ROBERT MORSE, WILLIAM PADE, DAVID SCOTT, DEBRA DOMEYER, JEFFREY KUPIETZKY, ALLEN MORGAN, LAWRENCE NG, SCOTT JARUS, KAMRAN POURZANJANI, ELIZABETH MURRAY, TOOD H. GREENE, and SCOTT MORROW, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 31, 2017
Date Decided: April 14, 2017
Date Corrected: April 25, 2017

P. Clarkson Collins, Jr., Lewis H. Lazarus, Nicolas Krawitz, MORRIS JAMES LLP, Wilmington, Delaware; Steven Kaufhold, KAUFHOLD GASKIN LLP, San Francisco, CA, *Counsel for The Frederick Hsu Living Trust.*

William M. Lafferty, Kevin M. Coen, Alexandra M. Cumings, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; David J. Berger, Catherine E. Moreno, WILSON SONSINI GOODRICH & ROSATI, PC, Palo Alto, California, *Counsel for Oak Hill Capital Partners III, L.P., Oak Hill Capital Management Partners III, L.P., OHCP GenPar III, L.P., OHCP MGP Partners III, L.P., OHCP MGP III, Ltd., Robert Morse, William Pade, and David Scott*.

A. Thompson Bayliss, April M. Ferraro, ABRAMS & BAYLISS LLP, Wilmington, Delaware, *Counsel for ODN Holding Corporation*.

Colm F. Connolly, Jody C. Barillare, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; Stephen D. Alexander, Emily L. Calmeyer, MORGAN, LEWIS & BOCKIUS LLP, Los Angeles, California; Timothy D. Katsiff, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, *Counsel for Debra Domeyer, Jeffrey Kupietzky, Allen Morgan, Scott Jarus, Kamran Pourzanjani, Elizabeth Murray, Todd H. Greene, and Scott Morrow.*

Kurt M. Heyman, Samuel T. Hirzel II, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Douglas Fuchs, GIBSON DUNN & CRUTCHER, Los Angeles, California, *Counsel for Lawrence Ng.*

**LASTER, Vice Chancellor**

In 2008, funds sponsored by the venture capital firm Oak Hill Capital Partners[1] invested $150 million in Oversee.net, a California corporation. To facilitate the investment, the parties formed ODN Holding Corporation (the "Company") as a holding company for Oversee.net. In return for its cash, Oak Hill received shares of Series A Preferred Stock (the "Preferred Stock") from the Company. Oak Hill had the right to require the Company to redeem its Preferred Stock in 2013.

In 2009, Oak Hill became the Company's controlling stockholder. Initially, little changed. The Company continued to expand through acquisitions and reinvested its capital for growth. Then, in 2011, the Company switched into liquidation mode. It stopped investing for growth, sold two of its four lines of business, and hoarded the resulting cash. When Oak Hill exercised its redemption right in 2013, the Company used as much of its cash as possible for redemptions. When that wasn't enough to redeem the Preferred Stock in full, the Company sold its third line of business and used the resulting cash for more redemptions. The process turned a once-promising company into a shell of its former self.

Frederick Hsu—one of the Company's founders—brought this action against Oak Hill, the Company's board of directors (the "Board"), and certain of the Company's officers. His complaint asserts claims sounding in both law and equity. At law, the complaint contends that the redemptions violated statutory limitations and common law doctrine because the Company lacked sufficient funds legally available to make the

---

[1] The specific funds are defendants Oak Hill Capital Partners III, L.P., Oak Hill Capital Management Partners III, L.P., OHCP GenPar III, L.P., OHCP MGP Partners III, L.P., and OHCP MGP III, Ltd. This decision refers to them collectively as "Oak Hill."

1

redemptions. In equity, the complaint contends that the individual defendants and Oak Hill breached their duty of loyalty by seeking in bad faith to benefit Oak Hill by maximizing the value of Oak Hill's redemption right, rather than by striving to maximize the value of the corporation over the long-term for the benefit of the undifferentiated equity. The Complaint asserts fallback counts against Oak Hill for aiding and abetting breaches of duty by the other defendants, against the directors for waste, and against Oak Hill and the officers for unjust enrichment.

The Complaint fails to state a claim for an unlawful redemption. Because of the capital-generating actions that the individual defendants took, the Company had sufficient funds legally available to make them.

The Complaint states a claim for breach of the duty of loyalty against Oak Hill and all but one of the individual defendants. The Complaint's detailed factual allegations support a reasonable inference that the individual defendants acted in bad faith to benefit Oak Hill by maximizing the value of its contractual redemption right, and the actions of Oak Hill's representatives are attributable to Oak Hill. The allegations support a reasonable inference that the entire fairness standard will apply and that the defendants will be unable to show that their course of conduct was entirely fair. The motions to dismiss the fiduciary duty claims are granted in one respect: defendant Kamran Pourzanjani is dismissed because it is not reasonably conceivable that he will not be entitled to exculpation.

The Complaint states a claim for aiding and abetting against Oak Hill. In the event that Oak Hill is found not to have acted in a fiduciary capacity, Oak Hill could be liable for knowingly participating in the breaches of duty committed by other defendants.

2

The Complaint fails to state a claim for waste. Although the Complaint supports a reasonable inference the defendants acted in bad faith when selling Company assets, the Company nonetheless received non-trivial consideration. The Complaint accordingly fails to meet the stringent standard required to state a claim for waste.

The Complaint states a claim for unjust enrichment. Oak Hill and the officer defendants received financial benefits from the course of conduct described in the Complaint. If those benefits resulted from breaches of duty, and if the defendants who received the benefits are not liable under a different theory, then the claim for unjust enrichment could serve as a vehicle for the Company to recover some or all of the improperly received benefits.

## I.    FACTUAL BACKGROUND

The facts for purposes of the motions to dismiss are drawn from the well-pled allegations of the Verified Class Action and Derivative Complaint (the "Complaint") and the documents it incorporates by reference. At this stage, the allegations of the complaint are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

This decision does not consider documents which the defendants submitted but which the Complaint did not quote or reference. Before filing suit, the plaintiff demanded books and records, thereby heeding the repeated admonition of the Delaware courts.[2] The

---

[2] *See, e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004) ("Both this Court and the Court of Chancery have continually advised plaintiffs who seek to plead facts establishing demand futility that the plaintiffs might successfully have used a Section 220 books and records inspection to uncover such facts."); *White v. Panic*, 783 A.2d 543, 556-57 (Del. 2001) ("[T]his case demonstrates the salutary effects of a rule encouraging plaintiffs to conduct a thorough investigation, using

3

Company and the plaintiff entered into a confidentiality agreement, and the plaintiff gained access to corporate minutes and other documents. The defendants claim that the drafters of the Complaint selected certain documents and misconstrued them, while ignoring other documents that contradicted their theories. The defendants ask that the omitted documents be deemed incorporated by reference into the Complaint, citing *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. 2016).

In *Yahoo!*, after a long and contentious fight over a demand for books and records, I ordered a corporation to produce certain documents. The corporation asked that the production be conditioned on the plaintiff incorporating the documents by reference into any subsequent complaint. I granted the request, relying on the court's authority under Section 220(c) to "prescribe any limitations or conditions with reference to the inspection,

the 'tools at hand' including the use of actions under 8 *Del. C.* § 220 for books and records, before filing a complaint . . . . [F]urther pre-suit investigation in this case may have yielded the particularized facts required to show that demand is excused or it may have revealed that the board acted in the best interests of the corporation."); *Brehm v. Eisner*, 746 A.2d 244, 266-67 (Del. 2000) (disregarding plaintiffs' complaint "that the system of requiring a stockholder to plead particularized facts in a derivative suit is basically unfair because the Court will not permit discovery under Chancery Rules 26-37 to marshal the facts necessary to establish that pre-suit demand is excused," and reasoning that "[p]laintiffs may well have the 'tools at hand' to develop the necessary facts for pleading purposes . . . [by] seek[ing] relevant books and records of the corporation under Section 220"); *Scattered Corp. v. Chi. Stock Exch.*, 701 A.2d 70, 79 (Del. 1997) ("Plaintiffs inexplicably did not bring [a Section 220 action before filing their derivative complaint.] Accordingly, plaintiffs cannot argue that they have used the available tools at hand to obtain the necessary information before filing a derivative action.") (internal quotations and citations omitted); *Sec. First Corp. v. U.S. Die Casting & Dev. Co*, 687 A.2d 563, 567 n.3 (Del. 1997) ("This Court has encouraged the use of Section 220 as an information-gathering tool in the derivative context, provided a purpose purposes is shown.") (internal quotations omitted); *Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) (expressing surprise at the rarity with which Section 220 has been used to gather information to satisfy Court of Chancery Rule 23.1).

or award such other or further relief as the Court may deem just and proper." 8 *Del. C.* § 220(c); *see United Techs. Corp. v. Treppel*, 109 A.3d 553, 557-58 (Del. 2014) (noting the "broad discretion" afforded to the Court of Chancery under Section 220(c)).

In this case, there has not been a prior ruling imposing an incorporation-by-reference condition, and the parties did not agree to one. Consequently, the Complaint and the documents it cites or incorporates by reference define "the universe of facts that the trial court may consider in ruling on a Rule 12(b)(6) motion to dismiss." *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

## A.   A Growing Company

Hsu and Lawrence Ng co-founded Oversee.net in 2000. Under their stewardship, Oversee became a "leading provider of technology-based marketing solutions to online publishers and advertisers worldwide." By 2007, the Company's annual revenue exceeded $200 million and its net income exceeded $19 million. At that point, the Company had four lines of business:

- Domain Monetization Services. This business drove Internet traffic derived from the Company's network of owned and managed domain names to online advertisers.

- Vertical Markets. This business provided marketers with leads from personal information collected by the Company's websites.

- Domain Aftermarket Services. This business sold domain names predominantly for third parties.

- Domain Registrar Services. This business charged fees for domain name registration and ancillary services.

5

Oversee grew internally by developing its own products and externally through acquisitions. During the eighteen-month period leading up to December 2007, Oversee made five acquisitions:

- In June 2006, Oversee paid $8.4 million for Field, Lake, and Sky LLC, an entity in the domain name acquisition space.

- In October 2006, Oversee paid $1.1 million for the assets of One Technologies L.P., a lead generator.

- In January 2007, Oversee paid $21.9 million for Lowfares.com, Inc., a company whose websites could be used to generate leads for the Vertical Markets business.

- In June 2007, Oversee paid $6.4 million for SnapNames.com, Inc. and an affiliate, both in the domain name acquisition space.

- In December 2007, Oversee paid $24.6 million for DomainSystems, Inc., a leader in domain name registration, aftermarket sales, and appraisal and escrow services.

**B.    Oak Hill Invests $150 Million.**

In February 2008, Oak Hill invested $150 million in Oversee. The parties formed a new Delaware corporation—the Company—to facilitate the transaction. Oversee became its wholly owned subsidiary. In return for its cash, Oak Hill received 53,380,783 shares of Preferred Stock.

The terms of the Preferred Stock gave Oak Hill the ability to exercise a mandatory redemption right beginning five years after its investment. The pertinent language stated:

> At any time after February 12, 2013, upon the written request of the holders of at least a majority of the then outstanding shares of [Preferred Stock], the [Company] shall redeem, out of funds legally available therefor, all of the outstanding shares of [Preferred Stock] which have not been converted into Common Stock pursuant to Section 4 hereof (the "**Redemption Date**"). The Redemption Date shall be determined in good faith by the Board and such Redemption Date shall be at least thirty (30) days, but not more than sixty (60) days, after the receipt by the [Company] of such written request. The [Company] shall redeem the shares of [Preferred Stock] by paying in cash an

6

amount equal to the Original Issue Price for such [Preferred Stock], plus an amount equal to all declared and unpaid dividends thereon (as adjusted for stock splits, stock dividends and the like, the "**Redemption Price**"). If the funds legally available for redemption of the [Preferred Stock] shall be insufficient to permit the payment to such holders of the full respective Redemption Price, the Corporation shall effect such redemption pro rata among the holders of the [Preferred Stock].

Dkt. 36, Ex. B, art. 5., § 6(a).

If the Company did not have sufficient funds to redeem the Preferred Stock, then the terms of the Preferred Stock contemplated ongoing redemptions as funds became available. The pertinent language stated:

If the funds of the [Company] legally available for redemption of shares of [Preferred Stock] on any Redemption Date are insufficient to redeem the total number of shares of [Preferred Stock] to be redeemed on such date, those funds which are legally available will be used to redeem the maximum possible number of such shares ratably among the holders of such shares to be redeemed based upon their holdings of [Preferred Stock]. The shares of [Preferred Stock] not redeemed shall remain outstanding and entitled to all the rights and preferences provided herein. At any time thereafter when additional funds of the [Company] are legally available for the redemption of shares of [Preferred Stock] such funds will immediately be used to redeem the balance of the shares which the [Company] has become obliged to redeem on any Redemption Date, but which it has not redeemed.

*Id.*, art. 5., § 6(d).

In 2009, the Company and Oak Hill modified these provisions. The amendments sought to impose on the Company a contractual obligation to raise capital for additional redemptions:

If the funds of the [Company] legally available for redemption of shares of [Preferred Stock] on any Redemption Date are insufficient to redeem the total number of shares of [Preferred Stock] to be redeemed on such date: (i) those funds which are legally available will be used to redeem the maximum possible number of such shares ratably among the holders of such shares . . . , and (ii) the [Company] thereafter shall take all reasonable actions (as

7

determined by the [Company's] Board of Directors in good faith and consistent with its fiduciary duties) to generate, as promptly as practicable, sufficient legally available funds to redeem all outstanding shares of [Preferred Stock], including by way of incurrence of indebtedness, issuance of equity, sale of assets, effecting a [merger or sale of assets] or otherwise . . . . At any time thereafter when additional funds of the [Company] are legally available for the redemption of shares of [Preferred Stock] such funds will immediately be used to redeem the balance of the shares which the [Company] has become obliged to redeem . . . .

Dkt. 36, Ex. C. The provision thus recognized that any actions to generate additional funds to redeem shares would be "determined by the [Company's] Board of Directors in good faith and consistent with its fiduciary duties."

This decision refers to Oak Hill's right to cause the Company to redeem the Preferred Stock as the "Redemption Right." It refers to the provisions that governed the redemption of the Preferred Stock collectively as the "Redemption Provisions."

## C.    Oak Hill Becomes The Company's Controlling Stockholder.

Oak Hill started as a minority investor. The Preferred Stock did not carry a majority of the Company's voting power, and Oak Hill only had the right to fill two seats on a seven-member Board. The Company's certificate of incorporation called for (i) two seats elected by the holders of the Preferred Stock voting as a separate class, (ii) three seats elected by the holders of the common stock voting as a separate class, and (iii) two seats elected by the holders of common stock and the Preferred Stock voting together. Oak Hill filled its two positions with Robert Morse, the Oak Hill partner who sponsored the investment, and William Pade, another Oak Hill partner.

In 2009, Oak Hill paid $24 million to purchase enough shares of common stock from Ng to give Oak Hill control over a majority of the Company's voting power. After

8

Oak Hill acquired mathematical control, the Board was enlarged to eight members, and a third Oak Hill representative—David Scott—became a director. Scott was an Oak Hill vice president. This decision refers to Morse, Pade, and Scott as the "Oak Hill Directors."

The other five Board members were Jeffrey Kupietzky, Ng, Allen Morgan, Scott Jarus, and Kamran Pourzanjani. Kupietzky served as the Company's President and Chief Executive Officer. The others were non-management directors, but the Complaint strives to paint them in hues of gray. The Complaint alleges that Ng now felt indebted to Oak Hill for paying him $24 million to purchase a substantial block of his otherwise illiquid common stock. The Complaint observes that Morgan worked for fifteen years as a corporate attorney with Wilson Sonsini Goodrich & Rosati, LLP, Oak Hill's current and long-time counsel. Morgan also served alongside Pade on the board of another company, and the two men had an ongoing social relationship through their sons, who were friends. The Complaint alleges that Morgan, Jarus, and Pourzanjani served regularly on boards of Silicon Valley companies, and this made them want to remain on good terms with Oak Hill because of its outsized influence within the highly networked Silicon Valley community.

Oak Hill's acquisition of majority control did not immediately result in any change in the Company's business strategy. For the next two years, the Company continued to focus on growth. Its pursuit of this strategy included the following acquisitions:

- In December 2009, the Company paid $4 million for New Venture Corporation, LLC, a company whose credit card website could be used to generate leads for the Vertical Markets business.

- In April 2010, the Company paid $2.7 million for T2Media, a company whose travel websites could be used to generate leads for the Vertical Markets business.

9

- In November 2010, the Company paid $17 million for Shopwiki Corporation, a company in the vertical markets space.

**D. Oak Hill Changes The Company's Strategy.**

The Complaint alleges that at some point during 2011, Oak Hill concluded that "exercising its contractual redemption right in February 2013 was the most effective way to achieve the return of its capital." Compl. ¶ 35. The Complaint alleges that beginning in 2011, Oak Hill caused the Company to alter its business plan by no longer focusing on growth, whether internally or by acquisition, and instead seeking to accumulate cash that could be used for redemptions.

Consistent with a directional reset, the Company changed its management team in mid-2011. In June 2011, defendant Scott Morrow became co-President alongside Kupietzky. In August 2011, Kupietzky left the Company. Defendant Debra Domeyer, who had been serving as the Company's Chief Technology Officer, became co-President with Morrow. In December 2011, one of the Company's outside directors—Pourzanjani—left the Board. His seat remained vacant.

Also consistent with a directional reset, the Company did not make any acquisitions during 2011. By the end of the year, the Company's cash reserves had nearly doubled, from $13.2 million at the end of 2010 to $23.7 million at the end of 2011.

Most significantly, the Company spent the second part of 2011 preparing to sell two of its four lines of business: the Domain Aftermarket Services business and the Domain Registrar Services business. The Company completed the sale in January 2012 for total proceeds of $15.4 million. The Company had paid more than $46.5 million in 2007 to

10

purchase two of the companies that comprised just part of the divested lines of business. Five years later, the Company sold the two lines of business in their entirety for a third of the price. The sale of the two lines of business had a dramatic effect on the Company's revenue-generating capacity. Total annual revenue dropped from $141 million in 2011 to $89 million in 2012.

## E. Further Moves In Preparation For Redemption

In May 2012, Domeyer became the Company's CEO and joined the Board. Pourzanjani was not replaced, so the Board had seven directors: the three Oak Hill Directors, Domeyer, Morgan, Jarus, and Ng.

Pade and Ng were the members of the Compensation Committee. In May 2012, they approved bonus agreements for Domeyer and two of the Company's senior officers: Elizabeth Murray, the Chief Financial Officer, and Todd Greene, the General Counsel. The agreements provided for special payments if the Company achieved a "liquidity event," defined to include the redemption of at least $75 million of Preferred Stock.

In 2012, the Company again did not make any acquisitions. By the end of the year, the Company's cash reserves had doubled a second time. At the end of 2011, the Company had $23.7 million in cash. By the end of 2012, it had $50 million. This was more than three times the Company's average end-of-year cash balance of $15.5 million during the period from 2007 to 2010, when the Company was in growth mode.

## F. The Committee

In August 2012, with the Redemption Right looming, the Board formed a special committee (the "Committee") charged with evaluating the Company's alternatives for

11

raising capital for redemptions and to negotiate with Oak Hill over the terms of any redemptions. The resolution creating the Committee provided that the Board would not approve any transaction relating to the Redemption Right without a prior favorable recommendation from the Committee. The resolution provided that the Committee's authority would terminate when Oak Hill exercised the Redemption Right.

The members of the Committee were Morgan and Jarus. The Committee held its first meeting on August 28, 2012. Morgan disclosed his social relationship with Pade. He did not disclose his service with Pade on another board or his relationship with Oak Hill through his work at Wilson Sonsini.

## G. The Officers' Recommendation

In September 2012, the Committee tasked Domeyer, Murray, and Greene—the three officers with bonuses tied to redemptions—with creating a proposal for Oak Hill. The officers determined that the Company only needed a cash reserve of $10 million, or one-fifth of the amount it had accumulated. This freed $40 million for other uses. The officers proposed that the Company use all of it redemptions, borrow an additional $35 million, and use all of that for redemptions as well. The total of $75 million would result in the Company redeeming half of the shares of the Preferred Stock, which had a contractual value of $150 million in the aggregate for purposes of redemptions. It also would trigger the officers' bonuses.

The officers worried that banks would not lend to the Company if they perceived that additional funds would be funneled to Oak Hill, so the officers proposed that the $75 million redemption be conditioned on Oak Hill not receiving any further redemptions until

2017. In October 2012, the Committee adopted the general framework of the recommendation but shortened the delay on further redemptions from 2017 until 2016.

Oak Hill rejected the proposal. Oak Hill countered by asking that the Company agree to redeem additional shares of Preferred Stock if the Company sold assets. Oak Hill also wanted a cumulative dividend of 12% per annum paid in kind on the unredeemed shares. The terms of the Preferred Stock did not give Oak Hill the right to a cumulative dividend, before or after the exercise of the Redemption Right. The terms of the Preferred Stock also recognized that the Company only was obligated to redeem as many shares of Preferred Stock as it could out of legally available funds and after that, the Board only had to generate funds for further redemptions consistent with its fiduciary duties. During the time it took to generate additional funds, Oak Hill was not entitled to any increase in the redemption price and had no other remedies. Oak Hill's request would cause the balance of the redemption obligation to compound at 12% per annum.

The Committee did not accept Oak Hill's counter. In November 2012, the Committee proposed that 100% of the net cash proceeds from any divestures outside the ordinary course of business would go towards redemptions and that Oak Hill would receive a 2% cumulative payment-in-kind dividend on any shares of Preferred Stock that were not redeemed. In return for these concessions, the Committee proposed that the Company would not make any additional redemptions until 2015.

Concurrently, Murray contacted several banks about a credit facility. Because the borrowings would be used for redemptions, only one bank would even consider a loan. That bank conditioned its proposal on Oak Hill guaranteeing repayment. Oak Hill refused.

13

The bank then offered a two-year term loan of $15 million, conditioned on the Company *not* using any of the proceeds for redemptions. The inability to secure financing prevented the Company from using debt to redeem a portion of the Preferred Stock, as the officers had proposed, and thereby hit the $75 million trigger for their bonuses.

**H.    Oak Hill's Demand And The Officers' Revised Recommendation**

On February 1, 2013, Pade told the Committee that Oak Hill intended to exercise the Redemption Right in full on the earliest possible date, *i.e.* February 13. Acknowledging that the Company did not have the funds to redeem the Preferred Stock in full, Pade proposed that the Company immediately make a redemption payment of $50 million, which he later reduced to $45 million. In return, Oak Hill would forbear on receiving further redemption payments until December 31, 2013. Under Pade's proposal, Oak Hill would have the right to cancel the forbearance agreement unilaterally and demand additional redemptions on thirty-days' notice.

On February 12, 2013, the Committee met to consider Pade's demand. One obvious problem was that using $45 million for redemptions would leave the Company with only $5 million in cash, which was half of the reserve of $10 million in cash that the officers had stated was necessary to support the Company's operations. During the period from 2007 to 2010, the Company ended each year with an average of $15.5 million in cash.

Conveniently, the officers changed their minds about how much cash the Company needed. Murray advised the Committee that she now believed $2 million in cash was sufficient. That figure permitted the Company to make the $45 million redemption payment that Oak Hill wanted.

14

The Committee did not seek any other changes in Oak Hill's proposal, such as more meaningful forbearance. Under Oak Hill's proposal, the thirty-day termination right rendered the forbearance offer largely illusory. Moreover, the offer at most contemplated forbearance of ten months. This was effectively the sleeves from Oak Hill's vest, because (i) Oak Hill had no ability to compel the Company to make redemptions except out of legally available funds, (ii) the Board had the right to determine how to raise additional funds in a manner that complied with its fiduciary duties, and (iii) one can readily doubt whether, after a $45 million redemption, the Company would have the capacity to make any additional redemptions during the remaining nine months of the year.

But the Committee did not push back. They resolved to recommend that the Board accept Oak Hill's terms.

## I.    The March Redemption

On February 13, 2013, Oak Hill exercised the Redemption Right in full and on the earliest possible date. In accordance with Generally Accepted Accounting Principles ("GAAP"), the Company reclassified Oak Hill's Preferred Stock as a current liability on its balance sheet in the amount of $150 million. The Committee's authority terminated with the exercise of the Redemption Right.

On February 27, 2013, the Board met to consider Oak Hill's demand for redemption. The Board concluded that the Company had sufficient surplus to redeem $45 million of Preferred Stock, as required by Section 160 of the Delaware General Corporation Law (the "DGCL"). 8 *Del. C.* § 160. In making this determination, the Board did not treat the Preferred Stock as a current liability of $150 million, as it appeared on the Company's

balance sheet. Had the Board done so, the Company would have had a deficit of $60 million and could not have redeemed any Preferred Stock.

Domeyer, Morgan, Jarus, and Ng voted to approve the redemption. The Oak Hill Directors abstained. On March 18, 2013, the Company paid Oak Hill $45 million to redeem shares of Preferred Stock (the "March Redemption"). Although Kupietzky was no longer employed by the Company, his employment agreement called for him to receive a bonus if shares of Preferred Stock were redeemed. He received $632,813, or approximately 1.4% of the redemption amount. Murray, Greene, and Domeyer did not receive a bonus, because their agreements required a redemption of at least $75 million to trigger their payments.

Hsu learned of the March Redemption on May 23, 2013, when Greene e-mailed him the Company's audited financial statements for 2012. Hsu was shocked. He e-mailed Greene:

> Well this is a surprise. Our "growth company" emptying its coffers to Oak Hill through redemption? How is this supposed to instill shareholder confidence? On April 5th I asked you if there were any material corporate transactions and to get this to me within a reasonable 5-7 days. How is it this is the first time I'm hearing of this?

Greene replied: "I believe you have been aware of the redemption right since Oak [Hill] made their investment back in 2008. . . . In February they provided a redemption notice pursuant to the charter and the company complied with its obligation to redeem the shares that it could." Greene's reply obscured the lengthy background leading up to the formal exercise of the Redemption Right.

In September 2013, Morse left Oak Hill and resigned from the Board. This left Pade and Scott as the Oak Hill representatives. Morse's seat was left vacant.

**J.      The September Redemption.**

In February 2014, Domeyer advised the Board that a strategic acquirer had expressed interest in purchasing the Domain Monetization business. After selling two lines of business in January 2012, the Company had two lines left. The Domain Monetization business was the Company's primary source of revenue.

Recognizing that any cash generated by the sale could be used for redemptions, and perceiving that this could create a conflict for the Oak Hill Directors, the Board reconstituted the Committee to oversee the negotiations. Its members again were Morgan and Jarus. The Committee delegated the actual negotiations to Domeyer, Murray, and Greene, the three members of management with bonuses tied to achieving $75 million in redemptions.

In April 2014, management reached an agreement to sell the Domain Monetization business for $40 million. The Committee recommended the deal to the Board, and the Board approved it on April 14.

The sale of the Domain Monetization business closed in May 2014. The Board moved quickly to deploy the resulting cash for redemptions. On June 4, the Board acted by written consent to reconstitute the Committee a third time, once again consisting of Morgan and Jarus, and charged the Committee with overseeing the redemption process.

The Board also decided to free up additional cash for redemptions through a restructuring. It would involve terminating certain executives, reducing the overall work force, and terminating the Company's lease on its Los Angeles headquarters. The Board charged the Committee with implementing the restructuring.

17

The Committee delegated the details of both tasks to Domeyer, Murray, and Greene. In July 2014, the officers presented a plan for the restructuring. The Committee rejected it because it did not cut costs enough. The Committee told the officers to cut more.

On August 4, 2014, the officers presented a revised plan. The Committee rejected it and told the officers to cut more.

On August 25, 2014, the full Board received an update on the Committee's work. The officers recommended a business plan that involved greater cost reductions and the sale of one of the three segments of the Company's lone remaining line of business, Vertical Markets. The full Board approved the new business plan with Pade, Scott, Domeyer, Morgan, and Jarus voting in favor. Ng abstained.

On August 29, 2014, the Committee determined that in light of the new business plan, the Company could make a redemption payment of $40 million to Oak Hill. The Committee resolved to ask Oak Hill to extend the forbearance agreement until March 31, 2015. One can readily question whether this term provided any benefit to the Company, because after a $40 million redemption, it was doubtful that the Company would have the capacity to redeem any additional shares during the next seven months.

The full Board met on September 2, 2014. The Board determined that the Company had sufficient surplus to make a redemption payment of $40 million. As before, the Board did not treat Oak Hill's remaining Preferred Stock as a current liability of $105 million, as it appeared on the Company's balance sheet. The Board approved the redemption payment on the terms recommended by the Committee, and the Company made the redemption (the "September Redemption").

18

The Company previously had redeemed $45 million in Preferred Stock through the March Redemption. The September Redemption brought the total to $85 million. That amount exceeded the $75 million redemption trigger for the officers' bonuses. Domeyer, Murray, and Greene each received a bonus of $587,184.

## K.    One More Divestiture

The sale of the Domain Monetization business left the Company with only its Vertical Markets line of business. It had three segments: Retail, Travel, and Consumer Finance. Retail generated nearly half of the Company's remaining revenue. The "crown jewel" of Retail was Shopwiki. In 2010, the Company acquired Shopwiki for $17 million. In December 2014, the Company sold Shopwiki for $600,000.

The sale of Shopwiki capped a remarkable period during which the Company sold three of its four lines of business in their entirety and divested the principal economic driver of the fourth line of business. The sales had a dramatic effect on the Company's cash-generating capacity. In 2011, before the divestitures, the Company generated annual revenue of $141 million. In 2015, after the divestitures, the Company generated annual revenue of $11 million, a decline of 92%.

On October 19, 2015, Ng left the Board. His seat remained vacant. The current Board comprises Pade, Scott, Domeyer, Morgan, and Jarus.

## L.    This Litigation

On December 11, 2015, Hsu received the Company's 2014 audited financial statements and learned of the September Redemption and the sale of Shopwiki. In January 2016, he sought books and record pursuant to Section 220 of the DGCL. 8 *Del C.* § 220.

19

The Company agreed to produce certain documents, including minutes of Board and Committee meetings.

On March 15, 2016, Hsu filed this action through his living trust, which holds his Company stock. The defendants have moved to dismiss the Complaint.

## II.     RULE 12(b)(6) ANALYSIS

The defendants have moved to dismiss the Complaint pursuant to Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering such a motion,

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.

*Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

The Complaint advances theories that fall under each part of the famous "twice tested" framework coined by corporate scholar and statesman Professor Adolf A. Berle. As he explained,

> in every case, corporate action must be twice tested: first, by the technical rules having to do with the existence and proper exercise of the power; second, by equitable rules somewhat analogous to those which apply in favor of a *cestui que trust* to the trustee's exercise of wide powers granted to him in the instrument making him a fiduciary.

Adolf A. Berle, *Corporate Powers as Powers in Trust*, 44 Harv. L. Rev. 1049, 1049 (1931). Delaware follows the "twice tested" framework when evaluating challenges to corporate acts.[3]

The Complaint advances six counts: (i) breach of fiduciary duty by the individual defendants, (ii) breach of fiduciary duty by Oak Hill, (iii) aiding and abetting a breach of fiduciary duty, (iv) waste, (v) engaging in unlawful redemptions, and (vi) unjust enrichment. The first four counts raise equitable challenges that fall under the second part of the twice-tested framework. The fifth count raises a legal challenge that falls under the first part of the twice-tested framework. The sixth is a fallback count that can be raised at law or in equity. In fealty to Berle, this decision addresses the legal challenge first, then proceeds to the equitable challenges. It addresses unjust enrichment last.

For the reasons that follow, the legal challenge asserted in Count V does not state a claim on which relief can be granted. The equitable challenges asserted in Counts I, II, and

---

[3] *Sample v. Morgan*, 914 A.2d 647, 672 (Del. Ch. 2007) (Strine, V.C.) ("Corporate acts thus must be 'twice-tested' – once by the law and again in equity."); *accord Quadrant Structured Prods. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014) ("Delaware law adheres to the twice-testing principle."), *aff'd*, 151 A.3d 447 (Del. 2016) (TABLE); *Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 641 (Del. Ch. 2013) ("Corporate acts are twice-tested, once for statutory compliance and again in equity."); *see In re Pure Res., Inc. S'holders Litig.*, 808 A.2d 421, 434 (Del. Ch. 2002) (Strine, V.C.) ("Nothing about [the doctrine of independent legal significance] alters the fundamental rule that inequitable actions in technical conformity with statutory law can be restrained by equity."). *See generally Schnell v. Chris-Craft Indus., Inc.*, 285 A.2d 437, 439 (Del. 1971) ("[I]nequitable action does not become permissible simply because it is legally possible."); *Marino v. Patriot Rail Co.*, 131 A.3d 325, 336 (Del. Ch. 2016) ("Post-1967 decisions by the Delaware Supreme Court . . . rendered untenable the strong-form contention that a statutory grant of authority necessarily foreclosed fiduciary review.").

III state claims on which relief can be granted. The waste claim asserted in Count IV falls short because the Company received some consideration in the challenged transactions. Count VI, unjust enrichment, survives.

## A.    The Unlawful Redemption Claim

Count V of the Complaint asserts that the defendants engaged in redemptions that violated Section 160 of the DGCL and principles of Delaware common law. This count disputes whether the Board had the legal power to cause the Company to engage in the redemptions. It therefore constitutes a challenge at law under Professor Berle's "twice tested" framework. This count does not state a claim on which relief could be granted.

Section 160 of the DGCL provides as follows.

> (a) Every corporation may purchase, redeem, receive, take or otherwise acquire . . . its own shares; provided, however, that no corporation shall:
>
> > (1) Purchase or redeem its own shares of capital stock for cash or other property when the capital of the corporation is impaired or when such purchase or redemption would cause any impairment of the capital of the corporation, except that a corporation . . . may purchase or redeem out of capital any of its own shares which are entitled upon any distribution of its assets, whether by dividend or in liquidation, to a preference over another class or series of its stock . . . if such shares will be retired upon their acquisition and the capital of the corporation reduced in accordance with §§ 243 and 244 of this title.

8 *Del. C.* § 160(a)(1). "A repurchase impairs capital if the funds used in the repurchase exceed the amount of the corporation's 'surplus,' defined by 8 *Del. C.* § 154 to mean the excess of net assets over the par value of the corporation's issued stock." *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997). "Net assets means the amount by which total assets exceed total liabilities." 8 *Del. C.* § 154. Under Section 160(a)(1),

22

therefore, unless a corporation redeems preferred shares and retires them upon redemption to reduce its capital, "a corporation may use only its surplus for the purchase of shares of its own capital stock." *In re Int'l Radiator Co.*, 92 A. 255, 256 (Del. Ch. 1914).

The Redemption Provisions additionally limit the Company to making redemptions out of "funds legally available." This phrase is not synonymous with "surplus." "Outside of the DGCL, a wide range of statutes and legal doctrines could restrict a corporation's ability to use funds, rendering them not 'legally available.'" *SV Inv. P'rs, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 985 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011). Among these, Delaware common law "has long restricted a corporation from redeeming its shares when the corporation is insolvent or would be rendered insolvent by the redemption." *Id.* (collecting cases). Consequently, "[a] corporation easily could have 'funds' and yet find that they were not 'legally available' . . . A corporation also could lack 'funds,' yet have the legal capacity to pay dividends or make redemptions because it had a large surplus." *Id.*

### 1.    The Preferred Stock As A Current Liability

The Complaint asserts that the Company lacked sufficient surplus to engage in the March and September Redemptions because the Preferred Stock should have been treated as a current liability for purposes of calculating the Company's net assets. After Oak Hill exercised its Redemption Right, the Company recorded the Preferred Stock on its balance sheet as a current liability with a value of $150 million. The Complaint alleges that if the Preferred Stock had been treated as a current liability for purposes of calculating surplus, consistent with the Company's balance sheet, then the Company would have had a negative

23

surplus when it engaged in the March and September Redemptions. Under that scenario, the redemptions would violate Section 160.

The Company was correct when it did not treat the Preferred Stock as a current liability. Delaware courts have held consistently that preferred stock is equity, not debt.[4] "The fundamental reason that . . . preferred shares are equity is that they provide no guaranteed right of payment."[5] "[T]he holder of preferred stock is not a creditor of the corporation. Such a holder has no legal right to annual payments of interest, as long term creditors will have, and most importantly has no maturity date with its prospect of capital repayment or remedies for default." *HB Korenvaes*, 1993 WL 205040, at *5.

---

[4] *See, e.g.*, *Thoughtworks*, 7 A.3d at 990-91 (contrasting preferred stock with debt); *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 39 n.8 (Del. Ch. 2013) ("[P]referred stock is senior in defined respects to common, but it is equity, not debt, and it remains subject to the statutory and common law limitations that apply to equity."); *Carsanaro*, 65 A.3d at 645 ("The restrictions on redemption imposed by Section 160 are one critical factor that distinguishes preferred stock from debt."); *Harbinger Capital P'rs Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 225 (Del. Ch. 2006) ("Even where preferred shares in some way straddle the line between debt and equity, the cases which have grappled with that question in the context of bankruptcy law have held, almost universally, that those shares are forms of equity."); *HB Korenvaes Invs., L.P. v. Marriot Corp.*, 1993 WL 205040, at *5 (Del. Ch. June 9, 1993) (Allen, C.) ("[T]he holder of preferred stock is not a creditor of the corporation."); *see also Mesa Hldg. Ltd. P'ship v. Bicoastal Corp.*, 1991 WL 17172, at *2 (Del. Ch. Feb. 11, 1991); *Moore v. Am. Fin. & Sec. Co.*, 73 A.2d 47, 48 (Del. Ch. 1950) (Seitz, V.C.); *Starring v. Am. Hair & Felt Co.*, 191 A. 887, 890 (Del. Ch. 1937) (Wolcott, C.), *aff'd*, 2 A.2d 249 (Del. 1937).

[5] *Harbinger*, 906 A.2d at 231; *accord* 11 *Fletcher's Cyclopedia of the Law of Private Corporations* § 5297 (perm. ed.) ("As against creditors of the corporation, preferred shareholders have no greater rights than common shareholders . . . [T]heir rights . . . are subordinate to the rights of such creditors, and consequently they are not entitled to any part of the corporate assets until the corporate debts are fully paid.").

The existence of a mandatory redemption right, even one that has ripened, does not convert the holder of preferred stock into a creditor. "A redemption right does not give the holder the absolute, unfettered ability to force the corporation to redeem shares under any circumstances." *Carsanaro*, 65 A.3d at 644. "Authority spanning three different centuries adverts to and enforces limitations on the ability of preferred stockholders to force redemption." *Thoughtworks*, 7 A.3d at 990.

The Preferred Stock in this case is no different. The Redemption Right that Oak Hill exercised was subject to statutory, common law, and contractual limitations. By statute, any redemptions were subject to the requirements of Section 160 of the DGCL. As a matter of common law, any redemptions were subject to limitations that included the restriction on redemptions "when the corporation is . . . or would be rendered insolvent." *Thoughtworks*, 7 A.3d at 985. By contract, under the terms of the Preferred Stock itself, any redemptions only could be made out of "funds legally available," and the Board only had an obligation to generate funds for redemptions through "reasonable actions (as determined by the [Company's] Board of Directors in good faith and consistent with its fiduciary duties) . . . ." Given these restrictions, the Board was not required to treat the Preferred Stock's redemption claim as a current liability when determining surplus.

The fact that the Company reclassified the Preferred Stock as a liability on its balance sheet in accordance with GAAP does not dictate a different conclusion. This court addressed that issue in *Harbinger*, where the plaintiff argued that because the company treated the plaintiff's preferred stock as a liability on its balance sheet, the plaintiff was a "creditor" with standing to bring a fraudulent conveyance claim. 906 A.2d at 222. The

25

*Harbinger* decision rejected the argument that the treatment of the preferred stock on the balance sheet converted an equity claim into a debt claim, noting that Delaware courts have long drawn "clear lines . . . between equity and debt holders," and that "it is not the role of [the Financial Accounting Standards Board, which promulgates GAAP rules] to enact such significant changes in Delaware law." *Id.* at 226-27.

Relatedly, the plaintiff contends that the Preferred Stock should be treated as a liability for purposes of the redemptions because the Company acted "as if the redemption obligation was a legally enforceable debt." Dkt. 51 at 88. Like the plaintiff in *Harbinger*, the plaintiff here relies on an opinion by the Circuit Court of Maryland, *Costa Brava Partnership II v. Telos Corp.*, 2006 WL 1313985 (Md. Cir. Ct. Mar. 30, 2006). The *Harbinger* decision did not regard *Costa Brava* as persuasive. First, in *Costa Brava*, the company's own certificate of incorporation characterized the preferred stock as "indebtedness."[6] Here, the Company's certificate of incorporation identifies the Preferred

---

[6] *Id.* at *5. The *Costa Brava* decision is not a hallmark of clarity. Vice Chancellor Lamb summarized what appears to have been the pertinent facts underlying the Maryland court's decision as follows:

> The [company] . . . actually attempted to reclassify its preferred shares as debt because the redemption date had already passed, the company was insolvent, and the first tranche of its repayment obligations were due. The company's efforts were in vain, however, because the covenants in its credit facility forbade the acquisition of additional debt. In the context of the impending repayment obligation, which triggered some unspecified remedy for the preferred shares, the *Costa Brava* complaint appears to have essentially alleged not only that the defendant was formally treating the preferred shares as debt, but that its very conduct was an attempt to consummate in fact the exchange transaction it could not complete under its credit facility.

26

Stock as a "class[] of capital stock." Dkt. 36, Ex. B. art. IV. Second, *Costa Brava* blurred the "clear lines Delaware courts have always drawn between equity and debt holders." *Harbinger*, 906 A.2d at 226. In doing so, *Costa Brava* ran contrary to the weight of Delaware precedent.

The Complaint's effort to treat the Preferred Stock as a *de facto* debt obligation also broadens the legal inquiry beyond what that step of the analysis contemplates. "Testing whether a transaction complies with the applicable business entity statute or the organizational documents of the entity is a different inquiry than determining whether those in control of the entity have exercised their powers in compliance with their fiduciary duties." *In re Kinder Morgan, Inc. Corp. Reorganization Litig.*, 2014 WL 5667334, at *8 (Del. Ch. Nov. 5, 2014), *aff'd sub nom. Haynes v. Kinder Morgan G.P., Inc.*, 136 A.2d 76 (Del. 2016). When interpreting another aspect of Section 160 of the DGCL, Chancellor Allen offered the following comments.

> As a general matter, those who must shape their conduct to conform to the dictates of statutory law should be able to satisfy such requirements by satisfying the literal demands of the law rather than being required to guess about the nature and extent of some broader or different restriction at the risk of an *ex post facto* determination of error. The utility of a literal approach to statutory construction is particularly apparent in the interpretation of the requirements of our corporation law—where both the statute itself and most transactions governed by it are carefully planned and result from a thoughtful and highly rational process.
>
> Thus, Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity

*Harbinger*, 906 A.2d at 228.

causes our law, in that setting, to reflect an enhanced respect for the literal statutory language.

*Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) (Allen, C.), *appeal refused*, 525 A.2d 582 (Del. 1987) (TABLE).

Section 160(a)(1) takes a snapshot of a corporation's financial condition at the time of the redemption and requires that the corporation have sufficient surplus at that time. Section 160 does not examine the steps that the corporation or its fiduciaries took to achieve the surplus. Whether the corporation and its fiduciaries acted properly in that regard is the domain of equity. The Complaint's allegations that the Company treated Oak Hill as a *de facto* creditor is an equitable claim which asserts that the Company's fiduciaries disloyally sought to maximize the value of Oak Hill's contractual right at the expense of the Company's residual claimants. Those allegations will be examined within the second part of Professor Berle's twice-tested framework.

The contention that the Company violated Section 160 of the DGCL because the Preferred Stock was a current liability or was treated as such does not state a claim on which relief can be granted. This aspect of the Complaint is dismissed.

### 2. The Redemptions As Risking Insolvency

The Complaint separately alleges that the March and September Redemptions violated Delaware common law because they "lessened the security of creditors and impaired the Company's ability to continue as a going concern." Compl. ¶ 147. As noted, Delaware common law prohibits redemptions that render a corporation insolvent. "A corporation may be insolvent under Delaware law either when its liabilities exceed its

28

assets or when it is unable to pay its debts as they come due." *Thoughtworks*, 7 A.3d at 987.

The limitation on redemptions that render a company insolvent goes beyond redemptions that result in immediate insolvency. "[A] redemption may destroy a corporation's ability to continue as a going concern, without immediately rendering it insolvent." *TCV VI, L.P. v. TradingScreen, Inc.*, 2015 WL 1598045, at *7 n.41 (Del. Ch. Feb. 26, 2015). The appropriate test is therefore whether a redemption left a corporation without "sufficient resources to operate for the foreseeable future."[7]

The Complaint does not allege facts supporting a reasonable inference that the redemptions rendered the Company insolvent or left the Company without sufficient resources to operate for the foreseeable future. After the September Redemption, the Company had $23 million in net assets. The Complaint therefore fails to allege that the Company was balance-sheet insolvent. The Complaint comes closer in alleging cash-flow

---

[7] *Id.* at *6. *See, e.g.*, *Int'l Radiator*, 92 A. at 255 (holding that redemptions may not "diminish the ability of the company to pay its debts, or lessen the security of its creditors"); *Topken, Loring & Schwartz, Inc. v. Schwartz*, 163 N.E. 735, 736 (N.Y. 1928) ("[A]ny agreement to purchase stock from a stockholder, which may result in the impairment of capital, will not be enforced, or will be considered illegal if the rights of creditors are affected."). *See generally* Richard M. Buxbaum, *Preferred Stock-Law and Draftsmanship*, 42 Cal. L. Rev. 243, 264 (1954) ("[A] contract of compulsory redemption is interpreted to require redemption 'if the company is not insolvent or will not thereby become insolvent' (or harm creditors or impair capital)."); Henry Winthrop Ballantine, *Ballantine on Corporations* 510 (rev. ed. 1946) (explaining that a redemption is unlawful "if it will endanger the collection of the corporate debts"); 2 Charles Fisk Beach, Jr., *Commentaries on the Law of Private Corporations* § 506 (1891) (explaining that "[t]he stockholder must come after the creditor" and that equity will intervene if "an injustice would be wrought upon corporate creditors and the other stockholders, by taking money from the treasury without which the enterprise would be crippled").

insolvency, because in 2015 the Company had a net loss of $500,000. But losing money is different from not being able to pay bills as they become due. With $23 million in net assets, the Company could weather a loss in a given year. To plead insolvency under the cash-flow test, the Complaint must allege more.

The Complaint also does not support a reasonable inference that the redemptions left the Company without sufficient resources to operate for the foreseeable future. Largely because the Company spent the preceding two years selling off its main lines of business, the Company did not need the same level of resources to operate. The Complaint describes an entity that was a shadow of its former self, with one partial line of business where it used to have four. The Company generated less revenue; it also had fewer employees and a smaller operational footprint. Given the Company's reduced state, the Complaint does not support a reasonable inference that the Company could not continue to operate. Whether Oak Hill and the individual defendants acted loyally by stockpiling cash, selling off businesses, and using the proceeds to make redemptions is an issue that will be evaluated in equity, not at law.

The contention that the redemptions violated the common law by rendering the Company insolvent or at material risk of becoming insolvent does not state a claim on which relief can be granted. This aspect of the Complaint is dismissed.

## B. The Claim For Breach Of Fiduciary Duty Against The Directors

Count I of the Complaint alleges that the directors breached their fiduciary duties by "abandoning the Company's growth strategy which was benefitting its common stockholders in favor of selling off whole business lines and hoarding cash in order to

30

provide the maximum amount Oak Hill could extract non-ratably from the Company by exercising its redemption right." Compl. ¶ 124. Analyzing this claim requires working through the standard of conduct, applying a standard of review, and then determining whether the defendants have properly invoked any immunities or defenses, such as exculpation.

"When determining whether directors have breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review."[8] "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *Trados II*, 73 A.3d at 35–36. For the reasons that follow, the Complaint adequately pleads conduct that implicates the duty of loyalty, the standard of review for evaluating whether a breach occurred is the entire fairness test, and the Complaint sufficiently pleads that the

---

[8] *Chen v. Howard Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014). *See* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002) [hereinafter *Realigning the Standard*]; William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001) [hereinafter *Function Over Form*]; *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1416–25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review); *see generally* Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L. Rev. 519, 553–58 (2012); Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L.Rev. 437, 461–67 (1993).

actions taken by the defendant directors were unfair. With one exception, the Complaint therefore states a non-exculpated claim against each of the director defendants. The exception is Pourzanjani, who is dismissed because it is not reasonably conceivable at this stage that he will not be entitled to exculpation.

## 1. The Standard of Conduct

Delaware corporate law starts from the bedrock principle that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors." 8 *Del. C.* § 141(a). "A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[9] "The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders." *Aronson*, 473 A.2d at 811.

---

[9] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). In *Brehm*, the Delaware Supreme Court overruled seven decisions, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *See* 746 A.2d at 253 n.13 (overruling in part on this issue *Scattered*, 701 A.2d at 72–73; *Grimes v. Donald*, 673 A.2d 1207, 1217 n.15 (Del. 1996); *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992); *Levine v. Smith*, 591 A.2d 194, 207 (Del. 1991); *Grobow v. Perot*, 539 A.2d 180, 186 (Del. 1988); *Pogostin v. Rice*, 480 A.2d 619, 624–25 (Del. 1984); and *Aronson*, 471 A.2d at 814). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. 746 A.2d at 254. The seven partially overruled precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review. Having described *Brehm*'s relationship to these cases, this decision omits the cumbersome subsequent history, because stating that they were overruled by *Brehm* creates the misimpression that *Brehm* rejected a series of foundational Delaware decisions.

32

Directors of a Delaware corporation owe two fiduciary duties—care and loyalty.[10] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Corporate fiduciaries "are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Stone*, 911 A.2d at 370 (internal quotation marks omitted). "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[11]

---

[10] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989) ("[D]irectors owe fiduciary duties of care and loyalty."); *Polk v. Good*, 507 A.2d 531, 536 (Del. 1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care.").

[11] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney II*, 906 A.2d at 67)); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he

In the standard Delaware formulation, fiduciary duties run not only to the corporation, but rather "to the corporation and its shareholders'"[12] The conjunctive expression "captures the foundational relationship in which directors owe duties to the corporation for the ultimate benefit of the entity's residual claimants." *Trados II*, 73 A.3d at 36–37. "It is, of course, accepted that a corporation may take steps, such as giving charitable contributions or paying higher wages, that do not maximize corporate profits currently. They may do so, however, because such activities are rationalized as producing greater profits over the long-term."[13] Decisions of this nature benefit the corporation as a whole, and by increasing the value of the corporation, the directors increase the quantum of value available for the residual claimants. Nevertheless, "Delaware case law is clear that the board of directors of a for-profit corporation . . . must, within the limits of its legal

---

had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[12] *In re Rural Metro Corp.*, 88 A.3d 54, 80 (Del. Ch. 2014) (quoting *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007)), *aff'd sub nom. RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015); *accord Mills*, 559 A.2d at 1280 ("[D]irectors owe fiduciary duties . . . to the corporation and its shareholders. . . ."); *Polk*, 507 A.2d at 536 ("In performing their duties the directors owe fundamental fiduciary duties . . . to the corporation and its shareholders.").

[13] Leo E. Strine, Jr., *Our Continuing Struggle with the Idea that For–Profit Corporations Seek Profit*, 47 Wake Forest L. Rev. 135, 147 n. 34 (2012) [hereinafter *For-Profit Corporations*]; *see TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del. Ch. Mar. 2, 1989) (Allen, C.) (noting that directors "may be sensitive to the claims of other 'corporate constituencies'" in pursuing the stockholders' long run interests).

discretion, treat stockholder welfare as the only end, considering other interests only to the extent that doing so is rationally related to stockholder welfare."[14]

Consequently, under Delaware law, for directors to act loyally to advance the best interests of the corporation means that they must seek "to promote the value of the corporation for the benefit of its stockholders."[15] In a world with many types of stock—

---

[14] Leo E. Strine, Jr., *A Job is Not a Hobby: The Judicial Revival of Corporate Paternalism and its Problematic Implications*, 41 J. Corp. L. 71, 107 (2015); *accord* Leo E. Strine, Jr. *The Dangers of Denial: The Need for a Clear-Eyed Understanding of the Power and Accountability Structure Established by the Delaware General Corporation Law*, 50 Wake Forest L. Rev 761, 771 (2015) [hereinafter *Dangers of Denial*] ("Non-stockholder constituencies and interests can be considered, but only instrumentally, in other words, when giving consideration to them can be justified as benefiting the stockholders."); *For-Profit Corporations*, *supra*, at 147 n.34 ("[S]tockholders' best interest must always, within legal limits, be the end. Other constituencies may be considered only instrumentally to advance that end.").

[15] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners.") (internal citation and quotations omitted); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) ("A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine Jr., *The Soviet Constitution Problem in Comparative Corporate Law: Testing the Proposition that European Corporate Law is More Stockholder Focused than U.S. Stockholder Law*, 89 S. Cal. L. Rev. 1239, 1249 (2016); ("[U]nder Delaware law . . . directors are required to focus on promoting stockholder welfare."); *Dangers of Denial*, *supra*, at 771 (2015) ("*Revlon* could not have been more clear that directors of a for-profit corporation must at all times pursue the best interests of the corporation's stockholders . . ."); Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

preferred stock, tracking stock, common stock with special rights, common stock with diminished rights (such as non-voting common stock), plain vanilla common stock, *etc.*—and many types of stockholders—record and beneficial holders, long-term holders, short-term traders, activists, momentum investors, noise traders, *etc.*—the question naturally arises: which stockholders? The answer is the stockholders in the aggregate in their capacity as residual claimants, which means the undifferentiated equity as a collective, without regard to any special rights.[16]

A Delaware corporation, by default, has a perpetual existence. 8 *Del. C.* §§ 102(b)(5), 122(1). Equity capital, by default, is permanent capital.[17] In terms of the standard

---

[16] *See*, *e.g.*, *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (stating that "corporate directors do not owe fiduciary duties to individual stockholders" but rather "to the entity and to the stockholders as a whole"); *Gilbert v. El Paso Corp.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("Directors' fiduciary duties run to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups."); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *10 (Del. Ch. Aug. 27, 1987) (Allen, C.) (holding that Delaware law "does not recognize a special duty on the part of directors elected by a special class to the class electing them"); *see generally* Abraham J.B. Cable, *Opportunity-Cost Conflicts in Corporate Law*, 66 Case W. Res. L. Rev. 51, 61, 89 (2015) [hereinafter *Opportunity Costs*] ("[C]ommon maximization rests on comparative opportunity costs and charges the board with making decisions like a fully committed entrepreneur in control of the company."); J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 49 (2014) ("The reference [to fiduciary duties running] to 'stockholders' means all of the corporation's stockholders as a collective. It means the stockholders as a whole . . ., which is what academics refer to as the 'single owner standard.'") (footnotes omitted).

[17] *See generally* Lynn A. Stout, *The Corporation as a Time Machine: Intergenerational Equity, Intergenerational Efficiency, and the Corporate Form*, 38 Seattle U. L. Rev. 685, 688 (2015); ("Put simply, once you use your money to purchase stock in a company, your money becomes the company's money. You have no legal power to demand it back."); Lynn A. Stout, *On the Nature of Corporations*, 2005 U. Ill. L. Rev. 253 (exploring implications of equity capital lock-in); Margaret M. Blair, *Locking in Capital:*

of conduct, therefore, the fiduciary relationship requires that the directors act prudently, loyally, and in good faith to maximize the value of the corporation over the long-term for the benefit of the providers of presumptively permanent equity capital, as warranted for an entity with a presumptively perpetual life in which the residual claimants have locked in their investment.[18]

---

*What Corporate Law Achieved for Business Organizers in the Nineteenth Century*, 51 UCLA L. Rev. 387 (2003) (tracing history of equity capital lock-in); Edward B. Rock & Michael L. Wachter, *Waiting for the Omelet to Set: Match–Specific Assets and Minority Oppression in Close Corporations*, 24 J. Corp. L. 913 (1999) (describing costs and benefits of equity capital lock-in).

[18] *See, e.g., Gantler v. Stephens*, 965 A.2d 695, 706 (Del. 2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[]"); *Trados II*, 73 A.3d at 37; *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 139 (Del. Ch. 2009) ("Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses."); *TW Servs.*, 1989 WL 20290, at \*7 (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"). *See generally* Leo E. Strine Jr. *Corporate Power Ratchet: The Courts' Ability in Eroding "We the People's" Ability to Constrain Our Corporate Creations*, 51 Harv. C.R.-C.L. L. Rev. 423, 440-41 (2015) ("[T]he directors must govern the corporation so as to generate the most sustainable profitability for the corporation's equity owners."); *Dangers of Denial*, *supra*, at 777 n.58 ("Promoting long-term corporate profitability is aligned with an outlook that is focused on maximizing shareholder welfare."); Andrew A. Schwartz, *The Perpetual Corporation*, 80 G. Wash. L. Rev. 764, 777–83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the protection of long-term value of capital committed indefinitely to the firm.").

The fact that shares are alienable by default, *see* 8 *Del. C.* § 202, does not alter the presumptively permanent nature of equity capital. Alienability ameliorates the effects of capital lock-in by enabling an individual holder to exit via sale, but it does not permit the capital to be removed from the entity. Selling simply substitutes a new owner as the holder of the bundle of rights associated with the equity. The capital remains locked in.

The fact that some holders of shares might be market participants who are eager to sell and would prefer a higher near-term market price likewise does not alter the presumptively long-term fiduciary focus. "The duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base."[19] Directors need not seek to maximize current market value for the benefit of the subset of stockholders who hope to sell in the near term and capture capital gains from the trade.[20]

---

[19] *Trados II*, 73 A.3d at 38. *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del. Ch. 2008) ("Directors are not thermometers, existing to register the ever-changing sentiments of stockholders. . . . During their term of office, directors may take good faith actions that they believe will benefit stockholders, even if they realize that the stockholders do not agree with them."); *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *30 (Del. Ch. July 14, 1989) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares. In fact, directors, not shareholders, are charged with the duty to manage the firm."), *aff'd in pertinent part*, 571 A.2d 1140 (Del. 1989); *TW Servs.*, 1989 WL 20290, at *8 n.14 ("While corporate democracy is a pertinent concept, a corporation is not a New England town meeting; directors, not shareholders, have responsibilities to manage the business and affairs of the corporation, subject however to a fiduciary obligation.").

[20] Even when a board of directors is considering a sale of the corporation that will fundamentally alter the form of the stockholders' investment, the obligation to maximize stockholder value does not require that the board simplistically take the nominally highest amount of cash available. Maximizing value can mean securing for stockholders an ownership interest in an entity, a package of other securities, or some combination, with or

It also bears emphasizing that a duty to maximize long-term value does not always mean acting to ensure the corporation's perpetual existence. A fiduciary might readily determine that a near-term sale or other shorter-horizon initiative, such as declaring a dividend, is value-maximizing even when judged against the long-term. A trade bidder with access to synergies, for example, may offer a price for a corporation beyond what its standalone value could support. Or fiduciaries might conclude that continuing to manage the corporation for the long-term would be value destroying because of external market forces or other factors. The directors who managed the proverbial maker of horse-and-buggy whips would have acted loyally by selling to a competitor before the new-fangled horseless carriage caught on. Writing as a Vice Chancellor, Chief Justice Strine provided an example in the extreme case of insolvency, explaining that the value-maximization mandate may require directors to favor liquidation over continuing the business:

> The maximization of the economic value of the firm might . . . require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced. . . .[21]

---

without cash, that will deliver greater value over the anticipated investment horizon. *See Paramount Commc'ns Inc. v. QVC Network*, 637 A.2d 34, 44 (Del. 1994) (describing how directors should approach consideration of non-cash or mixed consideration). *See generally* J. Travis Laster, Revlon *Is A Standard of Review: Why It's True and What It Means*, 19 Fordham J. Corp. & Fin. L. 5, 43-47 (2013).

[21] *Prod. Res. Gp., L.L.C. v. NCT Gp., Inc.*, 863 A.2d 772, 791 n.60 (Del. Ch. 2004); *see also Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *34 n.55 (Del. Ch. Dec. 30, 1991).

The same is true for a solvent corporation. "[D]irectors, generally, are obliged to chart a course for a corporation which is in its best interests without regard to a fixed investment horizon."[22] What the fiduciary principle requires in every scenario is that directors strive to maximize value for the benefit of the residual claimants.[23]

---

[22] *Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1150 (Del. 1989); *see* Mark J. Roe, *Corporate Short-Termism—In the Boardroom and in the Courtroom*, 68 Bus. L. 977, 981 (2013) ("[T]he long term is not to be preferred, just for its own sake, if it yields poorer returns and wastes resources.").

[23] Although long associated with *Revlon* and sales of control, where its application is perhaps most evident, Delaware authorities make clear that the value-maximizing principle is not unique to that context. *See In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 999 (Del. Ch. 2005) (Strine, V.C.) (noting that the obligation to maximize stockholder value "is rooted in old trust principles"); *Time*, 1989 WL 79880, at *25 ("*Revlon* was not a radical departure from existing Delaware, or other, law (*i.e.*, it has 'always' been the case that when a trustee or other fiduciary sells an asset for cash, his duty is to seek the single goal of getting the best available price) . . . ."); *Freedman v. Rest. Assocs. Indus., Inc.*, 1987 WL 14323, at *6 (Del. Ch. Oct. 16, 1987) (Allen, C.) ("The bedrock principle that a board owes a duty to shareholders to act only in pursuit of their interests is the principle that explains *Revlon*. Where the company is to be sold, it cannot be in conformity with that obligation to defeat a higher offer in favor of a lower one regardless of other considerations. So understood, *Revlon* is consistent with a very long line of cases."); *see also* Leo E. Strine, Jr., *Categorical Confusion: Deal Protection Measures in Stock–for–Stock Merger Agreements*, 56 Bus. Law. 919, 927 n. 25 (2001) (stating that the "[t]he *Revlon* principle grows out of the traditional principle that fiduciaries must sell trust assets for their highest value" and citing *Wilmington Trust Co. v. Coulter*, 200 A.2d 441, 448 (Del. 1964), and *Robinson v. Pittsburgh Oil Refining Corp.*, 126 A. 46, 49 (Del. Ch. 1924) (Wolcott, C.), as demonstrating that principle). "What changes under *Revlon* is not the universal and loyalty-based standard of conduct that obligates a fiduciary to strive to maximize value for the beneficiary, but rather the standard of review that a court uses when reviewing the fiduciary's decisions." *Forsythe v. ESC Fund Mgmt. Co. (U.S.)*, 2013 WL 458373, at *2 n.3 (Del. Ch. Feb. 6, 2013). Because of the subtle conflicts that permeate an M&A scenario, the standard of review narrows from rationality to range-of-reasonableness. *See In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007) (Strine, V.C.) ("What is important and different about the *Revlon* standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the *Revlon* standard contemplates a judicial examination of the reasonableness of the

Directors must exercise independent fiduciary judgment when considering how best to maximize stockholder value. "That duty may not be delegated to stockholders." *Time*, 571 A.2d at 1154. Diverse and atomistic stockholders "may have idiosyncratic reasons for preferring decisions that misallocate capital." *Trados II*, 73 A.3d at 38. More pertinent to the current case, "a particular class or series of stock may hold contractual rights against the corporation and desire outcomes that maximize the value of those rights."[24]

"A board does not owe fiduciary duties to preferred stockholders when considering whether or not to take corporate action that might trigger or circumvent the preferred stockholders' contractual rights."[25] As a general matter, "the rights and preferences of

---

board's decision-making process.") (footnote omitted); *accord In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 596 n. 170 (Del. Ch. 2010) (Strine, V.C.).

[24] *Trados II*, 73 A.2d at 38. *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *6 (Del. Ch. May 5, 2010). Special rights are usually, but not always, held by a class or series of preferred stock. By default, "all stock is created equal." *Id.* at *6. Unless a corporation's certificate of incorporation provides otherwise, each share of stock is common stock. If the certificate of incorporation grants a particular class or series of stock special "voting powers, . . . designations, preferences and relative, participating, optional or other special rights" superior to the common stock, then the class or series holding the rights is known as preferred stock. 8 *Del. C.* § 151(a); *see Starring*, 191 A. at 890 ("The term 'preferred stock' is of fairly definite import. There is no difficulty in understanding its general concept. [It] is of course a stock which in relation to other classes enjoys certain defined rights and privileges."), *aff'd*, 2 A.2d 249 (Del. 1937). *See generally* Leo E. Strine Jr., *Poor Pitiful or Potently Powerful Preferred?*, 161 U. Pa. L. Rev. 2025, 2027 (2013) [hereinafter *Powerful Preferred*] ("The prevailing theory is simple: preferred stockholders are preferred to the extent that they secure preferences (i.e. additional rights that may have economic value) in their contract.").

[25] *Trados II*, 73 A.3d at 39. *See LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 437 (Del. Ch. 2010) (Strine, V.C.) ("[O]nce the QuadraMed Board honored the special contractual rights of the preferred, it was entitled to favor the interests of the common stockholders."); *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2010 WL 2173838, at *7 (Del. Ch. May 28, 2010) ("[R]ights arising from documents governing a preferred class of

preferred stock are contractual in nature."[26] "Preferred stockholders are owed fiduciary

duties only when they do not invoke their special contractual rights and rely on a right

shared equally with the common stock."[27] Under those circumstances, "the existence of

---

stock, such as the Certificates, that are enjoyed solely by the preferred class, do not give rise to fiduciary duties because such rights are purely contractual in nature."); *MCG Capital*, 2010 WL 1782271, at *15 ("[D]irectors do not owe preferred shareholders any fiduciary duties with respect to [their contractual] rights."); *see also Simons v. Cogan*, 549 A.2d 300, 303 (Del. 1988) ("[A] convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties."); *Revlon*, 506 A.2d at 182 ("[T]he Revlon board could not make the requisite showing of [fiduciary] good faith by preferring the noteholders and ignoring its duty of loyalty to the shareholders. The rights of the former already were fixed by contract."); *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) (holding that former preferred stockholders who received debentures and a share of common stock were not owed fiduciary duties in their capacity as debenture holders and had only their contractual rights as creditors).

[26] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *7 (Del. Ch. July 24, 2009); *accord Rothschild Int'l Corp. v. Liggett Gp., Inc.*, 474 A.2d 133, 136 (Del. 1984) ("[P]referential rights are contractual in nature and therefore are governed by the express provisions of a company's certificate of incorporation"); *Judah v. Del. Tr. Co.*, 378 A.2d 624, 628 (Del. 1977) ("Generally, the provisions of the certificate of incorporation govern the rights of preferred shareholders, the certificate of incorporation being interpreted in accordance with the law of contracts, with only those rights which are embodied in the certificate granted to preferred shareholders."); *HB Korenvaes*, 1993 WL 205040, at *5 ("Rights of preferred stock are primarily but not exclusively contractual in nature. . . .[T]o a very large extent, to ask what are the rights of the preferred stock is to ask what are the rights and obligations created contractually by the certificate of designation."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 594 (Del. Ch. 1986) (Allen, C.) ("[W]ith respect to matters relating to the preferences or limitations that distinguish preferred stock from common, the duty of the corporation and its directors is essentially contractual and the scope of the duty is appropriately defined by reference to the specific words evidencing that contract.").

[27] *Trados II*, 73 A.3d at 39-40; *accord Jedwab*, 509 A.2d at 594; *HB Korenvaes*, 1993 WL 205040, at *5 (describing scenarios in which preferred stockholders were

such right and the correlative duty may be measured by equitable as well as legal standards."[28] For example, just as common stockholders can challenge a disproportionate allocation of merger consideration,[29] so too can preferred stockholders who do not possess and are not limited by a contractual entitlement.[30]

---

similarly situated to the common stockholders and hence could assert a claim for breach of fiduciary duty).

[28] *Jedwab*, 509 A.2d at 594; *accord Trados II*, 73 A.3d at 40; *LC Capital*, 990 A.2d at 449–50; *MCG Capital*, 2010 WL 1782271, at *15; *Trados I*, 2009 WL 2225958, at *7; *Rosan v. Chi. Milwaukee Corp.*, 1990 WL 13482, at *6 (Del. Ch. Feb. 6, 1990).

[29] *See, e.g., In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n. 57 (Del. Ch. Mar. 6, 2012) (considering challenge by common stockholders to transaction in which controlling stockholder received differential merger consideration); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011) (same); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (same); *In re Tele–Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *7 (Del. Ch. Dec. 21, 2005) (considering challenge to merger in which "a clear and significant benefit of nearly $300 million accrued primarily" to directors holding high-vote common stock (footnote omitted)); *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del. Ch. 2005) (considering challenge by common stockholders to transaction in which corporation was sold to third party but controlling stockholder received right to roll equity in transaction).

[30] *See In re FLS Hldgs., Inc. S'holders Litig.*, 1993 WL 104562, at *5 (Del. Ch. Apr. 2, 1993) (rejecting disclosure-only settlement of claims challenging merger in which all consideration went to the common stockholders and the preferred stockholders received nothing, holding that board comprised of directors holding common stock would likely bear the burden of proving that allocation of consideration was entirely fair, and noting that absence of independent bargaining agent or other meaningful procedural protections for the preferred made fairness "a substantial issue that is fairly litigable"); *Jedwab,* 509 A.2d at 595 (holding that preferred stockholder could challenge controller's allocation of merger consideration between preferred and common but concluding that the defendants were likely to meet their burden); *see also In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 950–51 (Del. Ch. 2001) (considering fiduciary challenge by holders of tracking stock with special rights and preferences; evaluating directors' ownership of tracking stock and applying business judgment rule because the directors' ownership stakes did not give rise to a material conflict of interest); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d

43

Because the fiduciary principle does not protect special preferences or rights, the fiduciary-based standard of conduct requires that decision makers focus on promoting the value of the undifferentiated equity in the aggregate. Given this obligation, "it is the duty of directors to pursue the best interests of the corporation and its common stockholders, if that can be done faithfully with the contractual promises owed to the preferred." *LC Capital*, 990 A.2d at 452.

> [T]he board owes no fiduciary duty to maximize the value of the preferred or to favor in any way the preferred over the common, except when contractually required. In fact, the law suggests that when push comes to shove, the board has a duty to prefer the common's interests, as pure equity holders, over any desire of the preferred for better treatment based on some generalized expectancy that they will receive special treatment beyond their contractual rights.

*Powerful Preferred*, *supra*, at 2028.

Consequently, it generally "will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc.*, of preferred stock." *Equity-Linked Invs., L.P. v. Adams*, 705 A.2d 1040, 1042 (Del. Ch. 1997) (Allen, C.). "[I]n circumstances where the interests of the common stockholders diverge from those of the preferred stockholders, it is possible that a director could breach her duty by improperly favoring the interests of the preferred stockholders

---

611, 617–18 (Del. Ch. 1999) (same); *Solomon v. Armstrong*, 747 A.2d 1098, 1117–18 (Del. Ch.1999) (same), *aff'd*, 746 A.2d 277 (Del. 2000) (TABLE).

over those of the common stockholders."[31] "This principle is not unique to preferred stock; it applies equally to other holders of contract rights against the corporation."[32]

### 2. The Continuing Operation Of The Fiduciary Standard Of Conduct In The Context Of A Corporate Contractual Obligation

The defendants argue that the fiduciary duty standard of conduct does not apply in this case because the Redemption Provisions imposed a clear contractual obligation on the Company. As they see it, the Company was bound by the Redemption Provisions, so the Company's directors did not have any decision to make about whether or not to comply with the Redemption Right. Because they had no room to exercise discretion, the fiduciary

---

[31] *Trados I*, 2009 WL 2225958, at *7; *accord LC Capital*, 990 A.2d at 447 (quoting *Trados I* and remarking that it "summarized the weight of authority very well").

[32] *Trados II*, 73 A.3d at 42. *See Gheewalla*, 930 A.2d at 101 ("When a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners."); *Revlon*, 506 A.2d at 182 ("[T]he Revlon board could not make the requisite showing of good faith by preferring the noteholders and ignoring its duty of loyalty to the shareholders."); *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 80, 85–86 (Del. Ch. 2004) ("[T]he allegation that the Defendant Directors approved a sale of substantially all of [the company's] assets and a resultant distribution of proceeds that went exclusively to the company's creditors raises a reasonable inference of disloyalty or intentional misconduct. Of course, it is also possible to infer (and the record at a later stage may well show) that the Director Defendants made a good faith judgment, after reasonable investigation, that there was no future for the business and no better alternative . . . . [I]t would appear that no transaction could have been worse for the unit holders and reasonable to infer . . . that a properly motivated board of directors would not have agreed to a proposal that wiped out the value of the common equity and surrendered all of that value to the company's creditors."); *see also Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 191–98 (Del. Ch. 2006) (Strine, V.C.) (applying business judgment rule to dismiss claims that directors of solvent corporation breached their duties by taking action to benefit subsidiary's sole stockholder at the expense of its creditors), *aff'd*, 931 A.2d 438 (Del. 2007) (TABLE).

standard of conduct could not apply. If the contractual obligation was triggered, then the corporation had an obligation to fulfill its contractual commitment. *See* Dkt. 59 at 2.

It is true that the fiduciary status of directors does not give them Houdini-like powers to escape from valid contracts.[33] The Delaware Supreme Court definitively settled this question in *Smith v. Van Gorkom*,[34] albeit in a less noticed (and less criticized) aspect of

---

[33] *Hokanson v. Petty*, 2008 WL 5169633, at *2 (Del. Ch. Nov. 3, 2008) (Strine, V.C.) (enforcing an option granted to acquire company by merger; rejecting fiduciary challenge to merger on grounds that the "directors were constrained by the Buyout Opinion Altiva had granted Exatech when Altiva was in financial peril in 2003"); *Halifax Fund, L.P. v. Response USA, Inc.*, 1997 WL 33173241, at *2 (Del. Ch. May 13, 1997) ("[T]here is no Delaware case that holds that the management of a Delaware corporation has a fiduciary duty that overrides and, therefore, permits the corporation to breach, its contractual obligations."); *Corwin v. DeTrey*, 1989 WL 146231, at *4 (Del. Ch. Dec. 4, 1989) ("[T]he directors of the selling corporation are not free to terminate an otherwise binding merger agreement just because they are fiduciaries and circumstances have changed.").

[34] 488 A.2d 858 (Del. 1985). This opinion omits *Van Gorkom*'s subsequent history, which is convoluted and potentially misleading. Strict rules of citation call for identifying *Van Gorkom* as having been overruled in part by *Gantler*. That case responded to *Van Gorkom*'s loose use of the term "ratification" to refer to the effect of an organic stockholder vote contemplated by the DGCL. The Delaware Supreme Court limited the use of the term "ratification" to its "classic" sense, namely situations where one decision-maker has made a decision unilaterally. 965 A.2d at 713. The decision overruled *Van Gorkom* to the extent the earlier case used the term "ratification" to refer to an organic vote called for by the DGCL. *See id.* at 713 n.54. Other than on this narrow point of terminology, *Gantler* did not overrule *Van Gorkom*. Unfortunately, *Gantler*'s attempt to correct the terminology used in *Van Gorkom* created the misimpression that the case had worked a broader change in Delaware law. The Delaware Supreme Court has held subsequently that *Gantler* did not have this broader consequence. *See Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 311 (Del. 2015). In my view, it muddies the waters to cite *Gantler* as having overruled *Van Gorkom* in part, both because *Gantler* only sought to clarify a point of terminology and because *Corwin* subsequently made clear that *Gantler* did not "unsettle a long-standing body of case law." *Id.*

that famous decision.[35] Only if the directors breached their fiduciary duties *when entering into a contract* does it become possible to invalidate it on fiduciary grounds.[36]

---

[35] *See, e.g.,* William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept*, 55 Bus. Law. 653, 654 (2000) ("One of the holdings of the Delaware Supreme Court in *Smith v. Van Gorkom* was that corporate directors have no fiduciary right (as opposed to power) to breach a contract.") (footnotes omitted); R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal-Protection Measures and the Merger Recommendation*, 96 Nw. U. L. Rev. 467, 468–69 (2002) ("In *Smith v. Van Gorkom*, the Delaware Supreme Court established that Delaware law does not give directors, just because they are fiduciaries, the right to accept better offers, distribute information to potential new bidders, or change their recommendation with respect to a merger agreement even if circumstances have changed.") (footnote omitted); John F. Johnston, *Recent Amendments to the Merger Sections of the DGCL Will Eliminate Some—But Not All—Fiduciary Out Negotiation and Drafting Issues*, 1 Mergers & Acquisitions L. Rep. 20, 777, 778 (July 20, 1998) (BNA) ("[T]here is . . . no public policy that permits fiduciaries to terminate an otherwise binding agreement because a better deal has come along, or circumstances have changed"); John F. Johnston & Frederick H. Alexander, *Fiduciary Outs and Exclusive Merger Agreements—Delaware Law and Practice*, 11 Insights No. 2, 15, 15 (Feb. 1997) ("[T]he Delaware Supreme Court held that directors of Delaware corporations may not rely on their status as fiduciaries as a basis for (1) terminating a merger agreement due to changed circumstances, including a better offer; or (2) negotiating with other bidders in order to develop a competing offer."); A. Gilchrist Sparks, III, *Merger Agreements Under Delaware Law—When Can Directors Change Their Minds?*, 51 U. Miami L. Rev. 815, 817 (1997) ("[*Van Gorkom*] makes it clear that under Delaware law there is no implied fiduciary out or trump card permitting a board to terminate a merger agreement before it is sent to a stockholder vote."). One decision speculates in *dictum* that *Omnicare* might have overruled *Van Gorkom* on this point, but it does not endorse or expound on that view. *See In re OPENLANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *10 n.53 (Del. Ch. Sept. 30, 2011) ("*Omnicare* may be read to say that there must be a fiduciary out in every merger agreement"). As I have explained at length elsewhere, I do not read *Omnicare* as standing for that principle or as having overruled *Van Gorkom*'s holding about binding contracts. *See generally* J. Travis Laster, Omnicare's *Silver Lining*, 38 J. Corp. L. 795, 818-27 (2013) [hereinafter *Silver Lining*].

[36] *See C & J Energy Servs., Inc. v. Miami Gen. Empls.'*, 107 A.3d 1049, 1072 (Del. 2014) (instructing trial courts not to divest third parties of their contract rights absent a sufficient showing that the contract resulted from a fiduciary breach and that the counterparty aided and abetted the breach); *WaveDivision Hldgs., LLC v. Millennium Dig. Media Sys.*, 2010 WL 3706624, at *17 (Del. Ch. Sept. 17, 2010) (Strine, V.C.) ("Delaware entities are free to enter into binding contracts without a fiduciary out so long as there was

But the fact that a corporation is bound by its valid contractual obligations does not mean that a board does not owe fiduciary duties when considering how to handle those contractual obligations; it rather means that the directors must evaluate the corporation's alternatives in a world where the contract is binding. Even with an iron-clad contractual obligation, there remains room for fiduciary discretion because of the doctrine of efficient breach.[37] Under that doctrine, a party to a contract may decide that its most advantageous course is to breach and pay damages. Just like any other decision maker, a board of directors may choose to breach if the benefits (broadly conceived) exceed the costs (again broadly conceived). *See Orban v. Field*, 1997 WL 153831, at \*9 (Del. Ch. Apr. 1, 1997) (Allen, C.) ("Certainly in some circumstances a board may elect (subject to the corporation's answering in contract damages) to repudiate a contractual obligation where to do so provides a net benefit to the corporation."). A corollary of this principle is that directors who choose to comply with a contract when it would be value-maximizing (broadly conceived) to breach could be subject, in theory, to a claim for breach of duty. For a contract with a third party, the business judgment rule typically will govern and prevent

---

no breach of fiduciary duty involved when entering into the contract in the first place."); *Sample*, 914 A.2d at 672 ("If a contract with a third-party is premised upon a breach of fiduciary duty, the contract may be unenforceable on equitable grounds and the third-party can find itself lacking the rights it thought it had secured."). *See generally* Restatement (Second) of Contracts § 193 (1981).

[37] *See generally Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 n.39 (Del. 2013) (recognizing principle of efficient breach); *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445–46 (Del. 1996) (same); *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at \*30 (Del. Ch. Nov. 17, 2014) (same).

such a claim from getting beyond the pleading stage, but the fiduciary standard of conduct remains operative and the underlying legal theory therefore exists. *See Hokanson*, 2008 WL 5169633, at *8 (dismissing claim for breach of fiduciary duty where "there is no indication that if the directors had refused to allow Exactech to exercise the Buyout Option unless it paid a higher price, the plaintiffs would have been any better off").

The corporation's legal duty to comply with a binding contract also does not foreclose the fiduciary standard of conduct from governing decisions that affect the extent to which a contingent, conditional, or otherwise potentially limited contractual obligation comes into effect.[38] Envision, for example, that a board faces two choices. One path generates higher nominal returns for the stockholders but would cause the corporation's debt to accelerate, yielding lower net returns for the equity. The other path generates lower nominal returns for the equity but would not cause the debt to accelerate, generating higher net returns. In this simplistic example, the fiduciary principle dictates the common sense result: the board should cause the corporation to pursue the option that generates the higher net returns for the undifferentiated equity in their capacity as residual claimants. If the board chose the path that triggered the corporation's debt, the board could be subject, in

---

[38] As previously discussed, a board of directors is not legally obligated to take steps to trigger or otherwise facilitate a special contractual right or preference. *See LC Capital*, 990 A.2d at 452; *Equity-Linked*, 705 A.2d at 1042; *see also In re Primedia Inc. Deriv. Litig.*, 910 A.2d 248, 259 (Del. Ch. 2006) (applying entire fairness to claim that controlling stockholder caused the company to call its preferred stock at full redemption price before the company was contractually obligated to do so); *Harbor Fin. P'rs v. Sugarman*, 1997 WL 162175, at *2 (Del. Ch. Apr. 7, 1997) (recognizing that a fiduciary may violate his duty of loyalty if he times a redemption to benefit preferred stockholders at the expense of common stockholders).

theory, to a claim for breach of duty. Here too, as a practical matter, the business judgment rule typically will govern and prevent such a claim from surviving a motion to dismiss, but the fiduciary standard of conduct remains operative.

In this case, the plaintiff is not relying on efficient breach, but rather on the application of the fiduciary standard of conduct to decisions that affect the scope of a contractual obligation. The Complaint asserts that the Board acted disloyally by selling businesses to raise cash to satisfy a future redemption obligation *before there was any contractual obligation to redeem the Preferred Stock*. The Complaint contends that if the Board had retained those businesses, they would have generated greater long-term value for the benefit of the undifferentiated equity. The plaintiff correctly observes that if the Company lacked either surplus or legally available funds when the Redemption Provisions otherwise came into play, then the Company would not have been able or obligated to redeem the Preferred Stock. At that point, the Board could have continued to manage the Company for the benefit of the undifferentiated equity without having to make a massive redemption payment. In substance, the Complaint alleges that before the Redemption Provisions came into effect, the Board breached its duty of loyalty by managing the Company to maximize the value of the Redemption Right, rather than managing the Company to maximize the value of the undifferentiated equity. The existence and binding nature of the Redemption Right does not foreclose the fiduciary standard of conduct from operating in this context.

Indeed, in this case, the plaintiff's theory has even greater salience because the Redemption Provisions recognize that if the Company does not have sufficient legally

50

available funds to redeem the Preferred Stock, then the Board's obligation to raise funds to support a redemption is constrained by its fiduciary obligation to the undifferentiated equity. In pertinent part, the Redemption Provisions state:

> If the funds of the [Company] legally available for redemption of shares of [Preferred Stock] on any Redemption Date are insufficient to redeem the total number of shares of [Preferred Stock] . . . (ii) the [Company] thereafter shall take all reasonable actions (*as determined by the [Company's] Board of Directors in good faith and consistent with its fiduciary duties*) to generate, as promptly as practicable, sufficient legally available funds to redeem all outstanding shares of [Preferred Stock], including by way of incurrence of indebtedness, issuance of equity, sale of assets, effecting a [merger or sale of assets] or otherwise . . . .

Dkt. 36, Ex. C. (emphasis added). After the Redemption Right ripened, if the Board had sold businesses to raise funds to redeem the Preferred Stock in a manner that compromised the Company's ability to generate long-term value for the benefit of the undifferentiated equity, then the Redemption Provisions themselves recognize that a plaintiff could assert a claim for breach of fiduciary duty. A comparable legal framework applies to actions that the Board took before the Redemption Right ripened.

What Oak Hill possessed and could enforce was a contractual right to require the Company to redeem the Preferred Stock to the extent the Company had surplus and legally available funds. What the Redemption Provisions do not foreclose is a claim by the undifferentiated equity that the directors breached their fiduciary duties when generating surplus and legally available funds. Consequently, there is room for a fiduciary duty theory on the facts of this case.

### 3. The Standard of Review

To determine whether directors have complied with the fiduciary standard of conduct, Delaware courts evaluate their actions through the lens of a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness."[39] The allegations of the Complaint support a reasonable inference that the directors acted to benefit Oak Hill, making entire fairness the applicable standard of review. The allegations of the Complaint also support a reasonable inference that the decision to generate funds to pay off Oak Hill by pursuing a course amounting to a *de facto* liquidation was not entirely fair to the undifferentiated equity. The claim for breach of fiduciary duty therefore survives analysis under Rule 12(b)(6).

Delaware's default standard of review is the business judgment rule. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. Unless a plaintiff rebuts one of the elements of the rule, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *Dollar Thrifty*, 14 A.3d at 598. Only when a decision lacks any rationally

---

[39] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Delaware's intermediate standard of review—enhanced scrutiny—is not implicated by this case.

conceivable basis will a court infer bad faith and a breach of duty.[40] The business judgment rule thus provides "something as close to non-review as our law contemplates." *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013) (Strine, V.C.). This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *Trados I*, 2009 WL 2225958, at *6. *See generally* Stephen M. Bainbridge, *The Business Judgment Rule as Abstention Doctrine*, 57 Vand. L. Rev. 83 (2004).

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, (*Technicolor Plenary*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotations omitted). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

---

[40] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co. S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an apparently well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently informed, disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority. *See Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"). If a board is evenly divided between compromised and non-compromised directors, then the plaintiff has succeeded in rebutting the business judgment rule.[41] Consequently, to determine whether to intensify the standard of review from business judgment to entire fairness, a court counts heads.[42] If a director-by-director analysis leaves insufficient directors to make up a board majority, then the court will review the board's decision for entire fairness.

"[T]he burden of pleading and proof is on the party challenging the decision to allege facts to rebut the presumption." *Solomon*, 747 A.2d at 1111–12. To plead that a director was interested and therefore cannot count towards the requisite majority, a plaintiff can allege facts showing that the director received "a personal financial benefit from a

---

[41] *See Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."); *see also Beam*, 845 A.2d at 1046 n.8 (noting for demand futility purposes that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Beneville v. York*, 769 A.2d 80, 85 (Del. Ch. 2000) (Strine, V.C.) (same).

[42] *See Cede*, 634 A.2d at 361, 364 (requiring director-by-director analysis); *Disney II*, 906 A.2d at 52 (affirming director-by-director analysis).

54

transaction that is not equally shared by the stockholders."[43] Or a plaintiff can allege facts

showing that the director was a dual fiduciary and owed a competing duty of loyalty to an

entity that itself stood on the other side of the transaction or received a unique benefit not

shared with the stockholders.[44] To plead that a director was not independent and therefore

cannot count towards the requisite board majority, a plaintiff can plead facts showing a

director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party

to undermine the director's ability to judge the matter on its merits.[45]

---

[43] *Rales*, 634 A.2d at 936 (citations omitted); *accord Cede*, 634 A.2d at 362 ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally." (footnote omitted)); *Pogostin*, 480 A.2d at 624 ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders." (footnote omitted)). "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (citing *Technicolor Plenary*, 663 A.2d at 1167). "[T]he benefit received by the director and not shared with stockholders must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *Trados I*, 2009 WL 2225958, at *6 (quoting *Gen. Motors*, 734 A.2d at 617).

[44] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (same); *see also Trados I*, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

[45] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman v. Beningson*, 1995 WL 716762, at *4 (Del. Ch. Dec. 4,

A plaintiff also may seek to call into question a director's ability to count as part of

the requisite majority by alleging facts that call into question whether the director acted in

good faith. Delaware law "clearly permits a judicial assessment of director good faith" for

the purpose of rebutting the business judgment rule. *Disney II*, 906 A.2d at 53; *accord*

*eBay*, 16 A.3d at 40. Bad faith encompasses both "an intent to harm [and] also intentional

dereliction of duty."[46] "A failure to act in good faith may be shown, for instance, where the

1995) (Allen, C.) ("The requirement that directors exercise *independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment*), directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (Strine, V.C.) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable." (internal footnote omitted)); *Chaffin v. GNI Grp.*, 1999 WL 721569, at *5 (Del. Ch. Sept. 3, 1999) (holding father-son relationship was sufficient to rebut presumption of independence; "Inherent in the parental relationship is the parent's natural desire to help his or her child succeed . . . [M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way."); *see also* *London v. Tyrrell*, 2010 WL 877528, at *14 n.60 (Del. Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then . . . it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

[46] *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009); *accord Disney II*, 906 A.2d at 64–66 (defining "subjective bad faith" as "conduct motivated by an actual intent to do harm," which "constitutes classic, quintessential bad faith," and "intentional

fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[47] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[48] Bad faith can be the result of "any emotion [that] may cause a director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[49]

---

dereliction of duty" as "a conscious disregard for one's responsibilities"); *see also Stone*, 911 A.2d at 370 (holding, in the context of an oversight claim, that "utter[] fail[ure] to implement any reporting or information system or controls" or, "having implemented such a system or controls, conscious[] fail[ure] to monitor or oversee its operations" demonstrated "a conscious disregard" for their fiduciary responsibilities).

[47] *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."); *see Gagliardi*, 683 A.2d at 1051 n.2 (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *RJR Nabisco*, 1989 WL 7036, at *15 (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[48] *Disney I*, 907 A.2d at 754; *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) (Strine, V.C.) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

[49] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (Strine, V.C.) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

57

In this case, a total of nine directors served on the Board during the time period covered by the Complaint: Morse, Pade, Scott, Domeyer, Kupietzky, Morgan, Ng, Jarus, and Pourzanjani. During this period, the number of directors fluctuated between five and eight. For entire fairness to apply, the Complaint must call into question the interests of either three or four directors, depending on the composition of the Board. The Complaint's allegations adequately call into question the interests of seven directors. This section therefore does not separately analyze the interests of Kupietzky, who left the Company in August 2011, or Pourzanjani, who left the Company in December 2011.

### a.     The Oak Hill Directors

Morse and Pade were principals of Oak Hill, and Scott was a vice president at Oak Hill. In those capacities, they owed fiduciary duties to Oak Hill. The Complaint's core theory is that Oak Hill wanted the Company to engage in a *de facto* liquidation to raise cash that Oak Hill could extract preferentially through its Redemption Right. For purposes of evaluating that theory, Morse, Pade, and Scott cannot count as independent or disinterested directors because each faced the dual fiduciary problem that the Delaware Supreme Court identified in *Weinberger*.

In the landmark *Weinberger* decision, the Delaware Supreme Court held that there is "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary obligations. 457 A.2d at 710. "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict." *Trados II*, 73 A.3d at 46-47; *see Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991). But if the interests of the beneficiaries diverge, the fiduciary faces an inherent conflict of

58

interest. "There is no 'safe harbor' for such divided loyalties in Delaware." *Weinberger*, 457 A.2d at 710.

The Complaint's allegations support a reasonable inference that at some point in 2011, Oak Hill's interests as a venture capitalist holding the Preferred Stock diverged from the interests of the Company and its common stockholders. Venture capitalists tend to seek high returns over a short period of time, typically a "ten-fold return of capital over a five-year period." Manuel A. Utset, *Reciprocal Fairness, Strategic Behavior & Venture Survival: A Theory of Venture Capital–Financed Firms*, 2002 Wis. L. Rev. 45, 60. To achieve these returns, venture capitalist try to focus resources on their likely winners while cutting their losses on likely losers. In particular,

> VC firms strive to avoid a so-called "sideways situation," also known as a "zombie company" or "the living dead," in which the entity is profitable and requires ongoing VC monitoring, but where the growth opportunities and prospects for exit are not high enough to generate an attractive internal rate of return. These companies are routinely liquidated, usually via trade sales, by venture capitalists hoping to turn to more promising ventures.

*Trados II*, 73 A.3d at 51 (internal citations and quotations omitted). These preferences interact with the return profile of preferred stock, which "carries special rights that create specific economic incentives that differ from those of common stock." *Id.* at 48. "Because of the preferred shareholders' liquidation preferences, they sometimes gain less from increases in firm value than they lose from decreases in firm value. This effect may cause a board dominated by preferred shareholders to choose lower-risk, lower-value investment

strategies over higher-risk, higher-value investment strategies."[50] The distorting effects of the preferred stock's special rights "are most likely to arise when, as is often the case, the firm is neither a complete failure nor a stunning success." *Trados II*, 73 A.3d at 49. The business model of VC firms and the return profile of preferred stock thus combine to generate interests that can diverge substantially from the interests of the undifferentiated equity in the aggregate. *Id.* at 50-51.

The Complaint supports a reasonable inference that by 2011, Oak Hill feared the Company would become a sideways situation and wanted to get its capital back as soon as possible. The Company's revenue had declined to $141 million, down from over $200 million in the year before Oak Hill invested. Compl. ¶¶ 28, 43. The Company was generating net income and would have had the potential to redeem small blocks of the Preferred Stock over time. *Compare Thoughtworks*, 7 A.3d at 980-81. But while that option was superior for the common stockholders, it was suboptimal for Oak Hill. The Complaint supports a reasonable inference that Oak Hill sought to use the Redemption Right to get back as much of its capital as possible. Oak Hill therefore used its influence as a controlling stockholder to cause the directors to pursue a *de facto* liquidation of the Company. That

---

[50] Jesse M. Fried & Mira Ganor, *Agency Costs of Venture Capitalist Control in Startups*, 81 N.Y.U. L.Rev. 967, 994 (2006); *accord* William W. Bratton & Michael L. Wachter, *A Theory of Preferred Stock*, 161 U. Pa. L. Rev. 1815, 1886 (2013) ("Preferred, as a senior claim, will avoid taking value-enhancing risk in a case where common, as the at-the-margin residual interest, would assume the risk.").

would generate a pool of otherwise unavailable cash which Oak Hill then could extract through redemption payments.[51]

The Complaint supports a reasonable inference that beginning in 2011, the Oak Hill Directors sought to serve Oak Hill's interests, rather than the interests of the Company. The allegations of the Complaint indicate that the Oak Hill Directors focused on the Redemption Right, and they identify a series of actions that benefited Oak Hill by creating a pool of cash that would maximize the value of the Redemption Right:

- In 2011, the Company stopped making acquisitions or investing in growth and began stockpiling cash. By the end of the year, its cash reserves had nearly doubled, from $13.2 million at the end of 2010 to $23.7 million at the end of 2011. The accumulation of cash benefitted Oak Hill by providing funds that could be used for redemptions.

- In June 2011, the Oak Hill Directors participated in a change of management. Kupietzky left, and Domeyer emerged as the new CEO. In December, an outside director (Pourzanjani) resigned. At this stage of the proceedings, the plaintiff is entitled to the reasonable inference that these changes were linked to a new business strategy that sought to maximize the value of the Redemption Right.

- During the second half of 2011, the Company prepared to sell two of its four businesses. In January 2012, the Oak Hill Directors joined the rest of the Board in approving the sale for total proceeds of $15.4 million. This was less than a third of what the Company had paid to buy just two of the companies that comprised part of the divested businesses. The Company's annual revenue dropped from $141 million

---

[51] The defendants argue that, unlike in *Trados I* and *II*, Oak Hill's interest was aligned with the common stockholders because Oak Hill also owned a substantial holding of common stock. Reply Br. at 30-31. The only support for this in the Complaint is Oak Hill's purchase of $24 million in common stock from Ng. Compl. ¶ 5. The value of that block is substantially less than Oak Hill's $150 million liquidation preference. A realistic understanding of Oak Hill's incentives would require a chart showing Oak Hill's return profile, which no one has provided. It is possible that at different price points, Oak Hill's incentives would diverge from the common stockholders to a greater or lesser degree. Regardless, based on the facts alleged in the Complaint, it is reasonable to infer that Oak Hill's interest diverged from those of the common stockholders.

61

pre-sale to $89 million post-sale, suggesting a multiple of sales price to revenue of 0.3. The timing and terms support a reasonable inference that the Company sold the lines of business to generate cash for redemptions.

- In May 2012, Pade voted with Ng as the two members of the Compensation Committee to give Domeyer, Murray, and Greene bonuses that would be triggered if the Company redeemed at least $75 million of Preferred Stock. The terms and timing support a reasonable inference that Pade and Ng were seeking to incentivize management to pursue redemptions for Oak Hill's benefit.

- During 2012, the Company continued to stockpile cash. By the end of the year, the Company's cash reserves had doubled a second time, reaching $50 million.

- In August 2012, the Oak Hill Directors joined with the other members of the Board in forming the Committee to evaluate the Company's alternatives for raising capital and to negotiate with Oak Hill over the terms of any redemption. The plaintiff is entitled to the reasonable inference that the Oak Hill Directors had been focused on the Redemption Right and planning for its exercise before this point. That is what sophisticated repeat players do.

- Pade bargained aggressively with the Committee over the Redemption Right, including demanding a 12% cumulative paid-in-kind dividend on any unredeemed shares and offering an illusory forbearance agreement. At the earliest possible date, Oak Hill exercised the Redemption Right for the full amount. These positions reinforce the inference that Oak Hill wanted to get as much capital out via its Redemption Right and to do so as soon as possible.

Given this series of events, it is reasonable to infer that Oak Hill wanted to maximize the value of its contractual Redemption Right and that the Oak Hill Directors pursued Oak Hill's interests.

The Complaint supports a reasonable inference that this pattern continued after the March Redemption. In early 2014, the Company negotiated to sell one of its two remaining lines of business. Recognizing that any cash generated by the sale could be used to redeem the Preferred Stock, and correctly perceiving that this could create a conflict for the Oak Hill Directors, the Board charged the Committee with overseeing the negotiations. Once a

deal had been reached, the Board charged the Committee with determining how much of the proceeds to use for redemptions and with implementing a broad restructuring initiative that would free up more cash for redemptions. In August 2014, the full Board adopted a business plan that contemplated further staff reductions and the sale of one segment of the Company's lone remaining line of business, Vertical Markets. The Oak Hill Directors participated in each of these decisions. Based on the sharply curtailed business plan, the Board approved the September Redemption.

Four months later, the Company sold Shopwiki for $600,000. In 2010, the Company had acquired Shopwiki for $17 million, and it was the Company's principal remaining source of revenue. The sale capped a remarkable two years during which the Company sold assets that generated 92% of its revenue and used the resulting cash, along with cash generated from operations, to redeem shares of Preferred Stock.

One reasonable explanation for the change in business strategy and large-scale divestitures is that the Company sought to generate cash to facilitate upcoming redemptions that it otherwise would not be able (or required) to make. The Oak Hill Directors were dual fiduciaries who owed duties both to Oak Hill and the Company. The Complaint's allegations support a reasonable inference that the Oak Hill Directors furthered Oak Hill's interests. The three Oak Hill Directors cannot be considered disinterested or independent for purposes of determining the standard of review.

### b. Domeyer

Domeyer served on the Board during the period when the Company took steps to maximize the value of the Redemption Right. Domeyer was not independent because she

63

was a highly compensated senior officer in a Company controlled by Oak Hill. "Under the great weight of Delaware precedent, senior corporate officers generally lack independence for purposes of evaluating matters that implicate the interests of the controller."[52] The fact that officers derive their principal income from their employment "powerfully strengthens the inference" that they cannot act independently from the controlling stockholder. *Mizel v. Connolly*, 1999 WL 550369, at *3 (Del. Ch. July 22, 1999). Domeyer derived her principal income from her employment. Compl. ¶ 17.

Domeyer also was interested in the steps taken to achieve the redemptions. Under Delaware law, a director is considered interested "when he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales*, 634 A.2d at 936. "Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin*, 765 A.2d at 923. "The benefit received by the director and not shared with stockholders must be of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest." *Trados I*, 2009 WL 2225958, at *6 (internal quotation omitted).

---

[52] *In re Ezcorp Consulting Agreement Deriv. Litig.*, 2016 WL 301245 at *35 (Del. Ch. Jan. 25, 2016) (collecting cases); *accord Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016) ("Mattrick is Zynga's CEO. Zynga's controlling stockholder, Pincus, is interested in the transaction under attack, and therefore, Mattrick cannot be considered independent.").

Domeyer entered into a bonus agreement with the Company that contemplated a special payment for achieving $75 million in redemptions of the Preferred Stock. None of the common stockholders enjoyed the prospect of a similar payout. Domeyer thus stood to receive a personal financial benefit not equally shared by the stockholders.

The Complaint's allegations support a reasonable inference that the magnitude of the benefit was material to Domeyer—and intentionally so. For achieving the a total of $85 million in redemptions, Domeyer received a bonus of $587,184. This figure is sufficiently large to support an inference of materiality at the pleading stage,[53] particularly when the purpose of the bonus appears to have been to incentivize Domeyer to pursue redemptions that would benefit Oak Hill.

### c.     The Outside Directors

The Complaint adequately alleges that Ng, Morgan, and Jarus acted disloyally for the bad faith purpose of maximizing the value of Oak Hill's Redemption Right by generating funds for redemptions that otherwise would not have been available, rather than by seeking to maximize the value of the Company for the benefit of its residual claimants. This is not the only possible inference, but it is a reasonable inference at this stage.

Taken as a whole, the allegations of the Complaint identify a constellation of actions, all of which favored the interests of Oak Hill by maximizing the value of its

---

[53] *Compare In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *11 (Del. Ch. Jan. 10, 2003) ($54,000 benefit sufficient for pleading-stage inference of materiality); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *9 (Del. Ch. June 26, 2001) (same for $91,000 benefit); *Friedman v. Beningson*, 1995 WL 716762, at *5 (Del. Ch. Dec. 4, 1995) (Allen, C.) (same for $48,000 benefit).

65

Redemption Right. First, the Company departed starkly from its historic business strategy. Until 2011, the Company emphasized long-term growth through reinvestment and acquisitions. The Company did not accumulate or sit on large stockpiles of cash. This only changed as Oak Hill's redemption right approached. The temporal relationship supports an inference that the directors' business decisions were motivated by the Redemption Right.

Second, the magnitude of the Company's divestitures suggests an intentional effort to create a pool of capital that Oak Hill could tap. Between 2012 and 2014, the Company sold three of its four lines of business and the "crown jewel" of its only remaining line of business. Several of these sales took place at prices far below what the Company had paid to acquire the assets and at times when management believed conditions were unfavorable. A reasonable inference at this stage is that the directors sought to generate cash for upcoming redemptions, even if that course was unfavorable to the Company's long-term prospects and the interests of its undifferentiated equity.

Third, Ng, Morgan, and Jarus took specific actions that helped Oak Hill. In May 2012, Ng joined Pade in approving bonus arrangements for the three senior officers. The agreements gave the officers a financial incentive to pursue redemptions.

During the second half of 2012, Morgan and Jarus negotiated with Oak Hill over the terms of a redemption. Based on the allegations of the Complaint, however, the positions they took favored Oak Hill and did little if anything for the Company. For example, the Committee proposed that Oak Hill receive a 2% cumulative paid-in-kind dividend on unredeemed shares in exchange for a forbearance right that Oak Hill could terminate on thirty-days' notice, under circumstances where Oak Hill had no effective

66

means of enforcing the Redemption Right if the Company did not have legally available funds, and when it was highly unlikely that the Company could generate additional funds for redemptions during the forbearance period. Although the evidence at a later stage may suggest something different, it appears at the pleadings stage that the Committee offered a material benefit to Oak Hill (the 2% cumulative dividend) for little if anything in return.

Morgan and Jarus reinforced the impression that they were acting for the benefit of Oak Hill after Oak Hill exercised the Redemption Right. Oak Hill demanded a redemption payment of $45 million. Management had opined previously that the Company needed a cash reserve of $10 million, which would not permit a $45 million redemption. Morgan and Jarus asked management to re-assess the reserve. After management conveniently reduced the reserve to $2 million, Morgan and Jarus endorsed making the full $45 million redemption on the terms requested by Oak Hill.

Morgan and Jarus again favored Oak Hill after the sale of the Domain Monetization business in May 2014. They took charge of both determining the terms for a further redemption and implementing a restructuring initiative that would make additional funds available for redemptions. Morgan and Jarus twice rejected management's business plans, insisting each time that management make deeper cuts that would free up more funds for Oak Hill. Morgan and Jarus then voted as part of the Board to approve a business plan that contemplated deeper staff cuts and the sale of one segment of the Company's lone remaining line of business. Based on the business plan, Morgan and Jarus recommended a redemption payment of $40 million to Oak Hill.

By taking these actions, Morgan and Jarus effectively treated Oak Hill as a creditor with an enforceable lien on the corporation's assets. "But the holder of preferred stock is not a creditor of the corporation. Such a holder has no legal right to annual payment of interest, as long term creditors will have, and most importantly has no maturity date with its prospect of capital repayment or remedies for default." *HB Korenvaes*, 1993 WL 205040, at \*5; *accord Harbinger*, 906 A.2d at 225 ("The holder of preferred stock is not a creditor of the corporation, and therefore does not have access to the remedies available to a creditor in addition to those generally available as a stockholder."). "A redemption right does not give the holder the absolute, unfettered ability to force the corporation to redeem shares under any such circumstances." *Carsanaro*, 65 A.3d at 644. "Mandatory redemption rights provide limited protection and function imperfectly, particularly when a corporation is struggling financially." *Thoughtworks*, 7 A.3d at 992. The Redemption Provisions did not require that the Company effectively liquidate itself. That Morgan and Jarus repeatedly took steps to benefit Oak Hill as if it were a secured creditor supports a reasonable inference that they acted to maximize the value of Oak Hill's Redemption Right rather than the long-term value of the Company for the benefit of the undifferentiated equity.

Although this course of conduct by itself is sufficient to call into question the motives of the outside directors, it is critical to remember that they acted in the shadow of a controlling stockholder, and that Morgan and Ng had additional reasons to favor Oak Hill's interests. A controlling stockholder transaction "of course is the context in which the greatest risk of undetectable bias may be present." *Kahn v. Tremont Corp.*, 1996 WL 145452, at \*7 (Del. Ch. Mar. 21, 1996) (Allen, C.), *rev'd on other grounds*, 694 A.2d 422

68

(Del. 1997). Although in theory a special committee of independent directors "is best positioned to extract a price at the highest possible level because it does not suffer from the collective action problem of disaggregated stockholders," the men and women who populate the committees are rarely individuals "whose own financial futures depend importantly on getting the best price and, history shows, [they] are sometimes timid, inept, or . . . , well, let's just say worse." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (Strine, V.C.). Particularly when a controller is present, there is the risk that "that the outside directors might be more independent in appearance than in substance." *Id.*; *accord* Leo E. Strine, Jr., *The Delaware Way: How We Do Corporate Law and Some of the New Challenges We (and Europe) Face*, 30 Del. J. Corp. L. 673, 678 (2005) (explaining that when a controller is present, there is "an obvious fear that even putatively independent directors may owe or feel a more-than-wholesome allegiance to the interests of the controller, rather than to the corporation and its [minority] stockholders").

Within this context, Morgan and Ng's links to Oak Hill take on greater color. Morgan worked for fifteen years as a corporate attorney with the law firm that acts as Oak Hill's long-time outside counsel, he served with Pade on another Board, and his son and Pade's son were friends. In 2011, Ng received $24 million when Oak Hill purchased a block of his otherwise illiquid stock. This decision need not consider whether these facts would be sufficient standing alone to call into question either director's motives. Considered together with the other allegations of the Complaint, these facts support the inference that the outside directors cannot be considered disinterested or independent for purposes of determining the standard of review.

### 4. The Effect Of The Committee On The Standard Of Review

Based on the foregoing, the Complaint has called into question the disinterestedness, independence, or proper motivation of seven directors. The Company therefore lacked a disinterested or independent board majority, so the standard of review becomes entire fairness. Ordinarily, when the facts of a case would call for entire fairness review, a board of directors can seek to obtain a more deferential standard of review by deploying protective devices, such as an independent committee or a majority-of-the-minority vote. In this case, the Board formed the Committee. But because of the nature of the allegations in this case, the use of the Committee does not alter the standard of review.

If a board of directors lacks an independent and disinterested majority, then the standard of review can de-escalate from entire fairness if the board exercised its authority under Section 141(c) to empower a committee of independent and disinterested directors to make the relevant decision. *See* 8 *Del. C.* § 141(c); *In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *27 (Del. Ch. May 22, 2000). If the board delegates its full power to address an issue to a committee, then the judicial analysis focuses on the committee. A decision made by a disinterested, independent, and informed majority of the committee receives business judgment deference. *See Trados II*, 73 A.3d at 65 n.39 ("The decision not to form a special committee had significant implications for this litigation. The Merger was not a transaction where a controller stood on both sides . . . . If a duly empowered and properly advised committee had approved the Merger, it could well have resulted in business judgment deference.")

70

By contrast, if a company also has a controlling stockholder, then the use of a committee alone is not sufficient because of the controller's influence over the members of the committee, which it can remove using its stockholder-level authority. The controller also has special negotiating advantages, such as the ability to obtain information about the controlled company through its agents and employees on the board or simply through its status as a dominant stockholder, the opportunity to time any transactional proposal advantageously, and the power to use its stockholder voting power or other rights to veto transactional alternatives to the controller's chosen transaction.[54]

This case falls in between a situation involving only board-level conflicts and a case involving a controlling stockholder that stands on both sides of the transaction. Oak Hill negotiated the redemptions directly opposite the Company, but in the shadow of the pre-existing Redemption Right. Oak Hill also was the intended beneficiary of the Board's decisions to accumulate cash and divest assets. In this context, Oak Hill could and did use its power as a controller. Oak Hill used its influence at the Board-level by having the Oak Hill Directors participate in key votes. The Oak Hill directors appear to have participated

---

[54] *See, e.g.*, *Rabkin v. Phillip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1103, 1107 (Del. 1985) (permitting fairness challenge to merger based on controller's allegedly unfair manipulation of the timing of the transaction); *Weinberger*, 457 A.2d at 711 (noting that factors affecting fairness include "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained"); *Cox Commc'ns*, 879 A.2d at 617 (positing that the entire fairness standard for controlling stockholder transactions rests on "a sincere concern that mergers with controlling stockholders involve an extraordinary potential for the exploitation by powerful insiders of their informational advantages and their voting clout").

in the management changes that took effect in mid-2011, as well as the change in business strategy that took place during that year. Through Pade, Oak Hill participated in the May 2012 decision to incentivize management to pursue redemptions by providing them with bonus arrangements. The Oak Hill Directors also participated in the Board decision in August 2014 to adopt a business plan that contemplated further staff reductions and the sale of one segment of the Company's lone remaining line of business. The implementation of this business plan led to the $40 million September Redemption. Oak Hill also appears to have influenced the timing of the sales that generated the pool of cash for redemptions.

Given these facts and the hybrid nature of the transactions at issue, the presence of a committee alone is not sufficient to lower the standard of review from entire fairness. Rather, as in a case involving classic self-dealing, the twin procedural protections of both an independent committee and a majority-of-the-minority vote would be required to restore the business judgment rule. *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014).

When, as here, only one of these protective devices is used, then the most that can be achieved is to shift the burden of proof under the entire fairness standard from the defendants to the plaintiffs. *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). Only a "well functioning" committee of independent directors can achieve this shift. *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 789 (Del. Ch. 2011) (Strine, C.), *aff'd sub nom. Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012). Determining whether a committee of independent directors is effective is a "fact-intensive inquiry." *Krasner v. Moffett*, 826 A.2d 277, 86 (Del. 2003). Shifting the burden of proof at the pleading stage "will normally be impossible" because defendants do not have the luxury

of arguing facts that would counter the plaintiffs' well-pled allegations that are assumed as true. *Orman v. Cullman*, 794 A.2d 5, 20 n.36 (Del. Ch. 2002).

In this case, this decision already has concluded that it is reasonably conceivable that Morgan and Jarus acted in bad faith to maximize the value of Oak Hill's Redemption Right, rather than in good faith to maximize the value of the Company for the benefit of the residual claimants. The Complaint therefore supports a reasonable inference that the Committee was not effective, and its use has no effect on the standard of review.

5.    **Applying The Entire Fairness Standard At The Pleading Stage**

When entire fairness applies, the defendant fiduciaries have the burden "to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders." *Disney II*, 906 A.2d at 52. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* Although the two aspects may be examined separately, "the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness." Id. But "perfection is not possible, or expected . . . ." *Id.* at 709 n.7. In this case, the Complaint supports a reasonable inference that the defendants' actions were not fair to the undifferentiated equity.

73

In terms of fair price, the Company radically altered its business strategy in the shadow of Oak Hill's Redemption Right. The Company reversed a long-time business plan that focused on achieving growth for the long term both internally and through acquisitions, and it began instead to stockpile cash. Beginning in 2012, the Company divested its major assets at prices substantially below what it had paid to acquire them. In January 2012, the Company sold two of its four business lines for $15.4 million, having paid $46.5 million to acquire only some of the assets in 2007. Those businesses contributed nearly half of the Company's revenue. In December 2014, the Company similarly sold Shopwiki, the crown jewel of its then-lone remaining line of business, for only $600,000. The Company had acquired the business in 2010 for $17 million.

The defendants might ultimately prove that these prices were fair. But at the pleading stage, the Complaint's allegations give rise to a reasonable inference that the Company failed to obtain fair prices in these transactions. Equally importantly, the Complaint supports a reasonable inference that it was not fair to the undifferentiated equity to stockpile the cash from the Company's operations and these transactions so that it would be available for redemptions. Before the Redemption Right ripened, the Company did not reinvest its accumulated cash. It held the cash until March 2013, when it used $45 million to redeem shares of Preferred Stock. The Complaint supports a reasonable inference that fiduciaries acting loyally would have continued to manage the Company for the long term, rather than stockpiling cash so that Oak Hill could sweep it up. The Complaint supports a reasonable inference that the directors unnecessarily diverted value to Oak Hill that otherwise would have accrued to the undifferentiated equity.

74

Although the Preferred Stock had a $150 million liquidation preference and carried a right to mandatory redemption at that price, Oak Hill did not have the ability to force the Company to make redemptions beyond the funds that were legally available. Oak Hill's Preferred Stock also did not carry a cumulative dividend. Preferred stock often carries a cumulative dividend which steadily increases the liquidation preference. *See Trados II*, 73 A.3d at 48. When present, a cumulative dividend reduces the prospect that a corporation will generate value for the undifferentiated equity, because the company not only must continue as a going concern but also generate "a sufficient return to escape the gravitational pull of the large liquidation preference and cumulative dividend." *Id.* at 77. In such a situation, the common stock may be functionally worthless, because the company can never realistically generate a sufficient return to pay off the preferred stockholders and yield value for the common. *Id.*

The Preferred Stock in this case did not pay a cumulative dividend. Dkt. 36, Ex. B at 4. Once the Redemption Right ripened, the Company had an obligation to use its legally available funds to redeem shares over time up to a total amount of $150 million, but the amount of the redemption obligation would not increase. To the contrary, because the Company would be redeeming the preferred over time with future dollars, the present value of the obligation would diminish. Over a long-term time horizon, the Company conceivably could have grown its business, gradually redeemed all of the Preferred Stock, and then generated returns for its common stockholders. The Preferred Stock was effectively trapped capital, and the Company could have used that capital for the benefit of the residual claimants. That type of scenario obviously was not appealing to Oak Hill,

which understandably wanted as much of its capital back, as soon as possible, so it could redeploy its capital in higher-returning investments. But what was beneficial to Oak Hill and what was fair to the Company and its common stockholders are two different things. The latter is measured by what faithful fiduciaries could have achieved in light of Oak Hill's relatively weak contractual position.

Instead of using the leverage that the Company had over Oak Hill for the benefit of the Company and its residual claimants, the directors engaged in hasty divestitures at seemingly fire-sale prices that virtually wiped out the Company's ability to generate income. Before the divestitures, the Company's four business lines generated $144 million in revenue. After the divestitures, the Company had one remaining line of business that generated $11 million in annual revenue and a net loss of $500,000. The allegations of the Complaint support a reasonable inference that dismembering the Company to maximize the value the Redemption Right did not yield a fair price for the undifferentiated equity.

The Complaint's allegations similarly support a reasonable inference that the defendants' conduct fell short in terms of fair dealing. When directors act in bad faith, it is "extraordinarily difficult for the defendant directors to prove that the transaction was entirely fair to the corporation because it would be difficult to demonstrate fair process." *Disney I*, 907 A.2d at 749 n.422. As explained above, it is reasonably conceivable that the directors acted in bad faith by effectively liquidating the company to maximize the value of Oak Hill's Preferred Stock.

The Complaint also alleges specific facts suggesting that particular aspects of the process were unfair. The Board used bonuses to incentivize management to favor a sale,

76

which effectively converted them "from holders of equity interests aligned with the common stock to claimants whose return profile and incentives closely resembled those of the preferred." *Trados II*, 73 A.3d at 61. The Complaint also alleges that the Company sold assets during periods that management considered unfavorable, which conceivably contributed to those assets being sold for seemingly low prices.

It bears emphasizing that this is a pleading-stage decision. It is possible that the directors approved the challenged course of action because they believed in good faith that it was in the best interest of the undifferentiated equity. Even though Oak Hill lacked a cumulative dividend, it is possible that they concluded that the Company's value would never exceed Oak Hill's $150 million liquidation preference, perhaps because the Company had no meaningful prospect as a going concern. Under those circumstances, the outside directors might reasonably conclude that gradually liquidating the business was value-maximizing, since it delivered value to the fulcrum security in the capital structure while taking nothing away from the worthless common stock.[55] At the motion to dismiss stage, however, the plaintiff receives the benefit of all reasonable inferences. For the

---

[55] *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *46 (Del. Ch. Sep. 4, 2014) ("Regardless of how much the Plaintiffs may have been diluted in the Recapitalization, because their common stock had no value that could have been diluted, the Plaintiffs necessarily received the substantial equivalent in value of what they had before.") (internal quotations omitted); *Trados II*, 73 A.3d at 76 ("If Trados's common stock had no economic value before the Merger, then the common stockholders received the substantial equivalent in value of what they had before . . ."); *Blackmore P'rs, L.P. v. Link Energy LLC*, 864 A.2d 85-86 (Del. Ch. 2004) (recognizing that a sale of a Company's assets and distribution of the proceeds to creditors might be fair if "there was no future for the business and no better alternative for the unitholders").

reasons explained at length above, it can be reasonably inferred that the directors acted to maximize the value of Oak Hill's Preferred Stock rather than seeking to promote the long-term value of the Company for the benefit of the undifferentiated equity, and that the resulting transactions were unfair to the Company's common stockholders.

### 6.    Exculpation

The Company's certificate of incorporation contains a provision that exculpates the directors from personal liability to the fullest extent permitted by Delaware law. Dkt. 37 Ex. B, at 20. When a corporation's charter contains such a provision,

> [a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct, be it *Revlon*, *Unocal*, the entire fairness standard or the business judgment rule.

*In re Cornerstone Therapeutics Inc. S'holders Litig.*, 115 A.3d 1173, 1175-76 (Del. 2015). To state a claim against each individual director, the Complaint must "plead[] facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interest, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." *Id.* at 1179-80.

For the reasons discussed above, the Complaint supports a reasonable inference that the Oak Hill Directors, Domeyer, Morgan, Jarus, and Ng will not be entitled to exculpation. The Oak Hill Directors were not independent of Oak Hill because they were Oak Hill fiduciaries, and the Complaint supports a reasonable inference that they acted disloyally. Domeyer was a senior officer of the Company and beholden to Oak Hill; she also was interested in the redemptions because of her bonus agreement. It is reasonably conceivable

78

that she acted disloyally. The Complaint supports a reasonable inference that Morgan, Jarus, and Ng acted in bad faith to serve the interests of Oak Hill. None of these theories would give rise to an exculpated claim. The Complaint also supports a reasonable inference that Domeyer could be liable in her capacity as an officer, in which case she would not be entitled to exculpation. *See Gantler*, 625 A.2d at 709 n.37. None of these defendants are entitled to be dismissed because of the Company's exculpatory provision.

The Complaint also names as a defendant Kupietzky, who served as the Company's CEO and as a director until August 2011. He has been sued both in his capacity as an officer and as a director. The Complaint alleges that he participated in the change in the Company's direction during 2011, and he also was a party to a bonus agreement tied to a redemption of the Preferred Stock. After the March Redemption, he received a bonus of $632,813. He conceivably could have acted disloyally in light of his conflicting incentives. He also faces a risk of liability as an officer, where he is not entitled to exculpation.

The Complaint finally names Pourzanjani as a defendant. He served as a director until December 2011, when he resigned. The Complaint alleges generally that Pourzanjani served on boards of Silicon Valley companies, giving him a reason to want to remain in Oak Hill's good graces, but it does not provide any support for this assertion. It is not enough for a pleading simply to allege in conclusory fashion that a director has a particular disqualifying interest; the complaint must plead facts sufficient to support a reasonable inference that the director in fact possessed and fell prey to that interest in the specific

case.[56] Rather than supporting a reasonable inference that he served Oak Hill's interest, Pourzanjani's decision to resign in December 2011, shortly after the reorientation of the Company, supports a reasonable inference that he disagreed with what was happening. Perhaps he left for other reasons. Under no circumstances, however, could one infer from his early departure that he sought in bad faith to maximize the value of Oak Hill's Redemption Right. It is not reasonably conceivable that Pourzanjani would not be entitled to exculpation, so the claims against him are dismissed.

### 7. Abstention

The Oak Hill Directors argue that they cannot be liable because they recused themselves from voting on the specific decisions that the Board made to redeem Oak Hill's shares and, according to them, did not improperly influence their fellow directors. This argument fails at the pleading stage.

"Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that

---

[56] *See Chen*, 87 A.3d at 672 (dismissing claims against directors who were affiliated with private equity funds where plaintiffs did not adequately support assertion that the funds faced liquidity issues); *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 66 (Del. Ch. 2013) (Strine, C.). (dismissing complaint challenging sale that was the product of a lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware . . . and that they all had the time and fair opportunity to bid" and rejecting allegation that certain directors were conflicted because they were affiliated with a private equity firm that "typically flips companies it invests in every three to five years" and favored a sale to achieve liquidity for the investors in one of its funds and to invest in a new fund); *Trados II*, 73 A.3d at 54 ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of evidence that Prang was not disinterested or independent in this case.").

the board's decision to approve that transaction was wrongful." *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at \*2 (Del. Ch. Mar. 9, 1995). But this is "not an invariable rule." *Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007).

> One might, for example, imagine a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. As part of the conspiracy, those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability. In such circumstances it is highly unlikely that those directors' "nonvote" would be accorded exculpatory significance.

*Tri-Star Pictures*, 1995 WL 106520, at \*3. An absent director also might be held liable if the director "play[ed] a role in the negotiation, structuring, or approval of the proposal." *Valeant*, 921 A.2d at 753. "Similarly, an absent director . . . who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors." *Id.* at 753-54. Or a court might hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director was "closely involved with the challenged [transaction] from the very beginning" and the transaction was rendered unfair "based, in large part," on the director's involvement. *Gesoff*, 902 A.2d at 1166 n.202.

In this case, the Complaint supports a reasonable inference that the Oak Hill Directors could be held liable even though they abstained from the formal votes on the March and September Redemptions. All of the Oak Hill Directors were involved in many of the decisions that give rise to the Complaint, including (i) the decision in 2011 to abandon the Company's traditional business plan and begin accumulating cash and selling

off assets, (ii) the decision in 2012 to sell two of the Company's lines of business, and (iii) the decision in 2014 to engage in a restructuring that would free up additional funds for redemptions. Pade additionally was involved in tying the officers' bonuses to redemptions. It is also reasonably conceivable in light of the allegations of the Complaint as a whole that the Oak Hill Directors engaged in behind-the-scenes communications with their fellow directors, including Morgan, on critical matters.

At this stage, the Complaint supports a reasonable inference that the Oak Hill Directors each participated sufficiently in the events giving rise to the case to be liable for breaching their duty of loyalty. The fact that they abstained from two discrete votes does not provide grounds for a pleading-stage dismissal.

## C.     The Breach Of Fiduciary Duty Claim Against The Officers

Count I of the Complaint also asserts a claim against Kupietzky, Morrow, Domeyer, Murray, and Greene for breach of fiduciary duty as officers. "[C]orporate officers owe fiduciary duties that are identical to those owed by corporate directors." *Gantler*, 965 A.2d at 708. Like directors, officers breach the duty of loyalty if they "act[] in bad faith for a purpose other than advancing the best interests of the corporation."[57]

---

[57] *Hampshire Gp. Ltd. v. Kuttner*, 2010 WL 2739995, at *12 (Del. Ch. July 12, 2010) (Strine, V.C.); *accord Chen*, 87 A.3d at 687 (denying summary judgment for claims against officers based on evidence "supporting a reasonable inference of favoritism towards [a potential buyer] consistent with [the officers'] personal financial interests rather than the pursuit of maximal value for the stockholders."); *Dweck v. Nasser*, 2012 WL 161590, at *19 (Del. Ch. Jan. 18, 2012) (observing that officers may be liable if they "consciously facilitate[] wrongful action by another for a purpose other than advancing the best interests of the corporation.").

The Complaint supports a reasonable inference that each of the officer defendants favored Oak Hill's interests over the undifferentiated equity because they were not independent of Oak Hill. Each of them reported to a Board controlled by Oak Hill. Each of them was therefore conceivably beholden to Oak Hill for their continued employment, calling into question their independence. The Complaint also supports a reasonable inference that Kupietzky, Domeyer, Murray, and Greene favored Oak Hill's interests because each had a personal interest in achieving redemptions. Each was a party to a bonus agreement that promised a special payment if the Preferred Stock was redeemed.

The Complaint pleads facts supporting a reasonable inference that Kupietzky, Morrow, Domeyer, Murray, and Greene acted disloyally to favor Oak Hill's interests, consistent with their incentives. The Complaint has the most to say about Domeyer, Murray, and Greene. A few months after signing their bonus agreements, they developed a proposal to redeem exactly the amount of Preferred Stock necessary to trigger their bonuses. They proposed using $40 million of the Company's accumulated cash, plus $35 million in borrowings for a total redemption payment of $75 million. A key assumption was that the Company only needed a cash reserve of $10 million. That amount represented one-fifth of what the Company had accumulated and two-thirds of what the Company's average year-end cash balance had been from 2007 to 2011. When the officers could not convince a bank to finance the redemption, and after Oak Hill demanded an initial redemption payment of $45 million, the officers conveniently revised their estimate of the required cash reserve, reducing it by 80% to $2 million. That figure enabled the Company to make the full redemption payment that Oak Hill wanted. Later in the process, the officers

generated a new business plan that freed up more cash for redemptions, revising it on three occasions to free up more funds that the Company could use for redemptions. Based on these facts, it is reasonably conceivable that Domeyer, Murray, and Greene breached their fiduciary duties as officers by consciously acting to favor Oak Hill's interests, consistent with their personal and financial incentives. *See Chen*, 87 A.3d at 687.

The Complaint fails to include similarly specific allegations about Kupietzky or Morrow's involvement. Kupietzky was the Company's CEO and President until August 2011. Morrow was the Company's co-President from June 2011 to May 2012. During 2011, the Company changed its strategy from focusing on internal and external growth to selling off assets and stockpiling cash. It is reasonably conceivable that Kupietzky and Morrow changed the Company's strategy to serve Oak Hill's interests. The inference is stronger for Kupietzky, because he had a bonus triggered by redemptions.

After Kupietzky left and while Morrow served as co-President with Domeyer, the Company sold its two principal lines of business. The sales were completed in January 2012, which means the Company was preparing for the sales during the second part of 2011. The Company had paid more than $46.5 million in 2007 to purchase two of the companies that comprised just part of the divested lines. Five years later, the Company sold the two lines in their entirety for a third of the price. The Company did not re-invest the cash; it held it for use when redeeming the Preferred Stock. Given Morrow's senior role, the claim against him survives.

84

I confess that the claims against Kupietzky and Morrow strike me as weaker than the other claims in the case, but relative weakness is not grounds for dismissal. Given the plaintiff-friendly standard that governs a Rule 12(b)(6) motion, these claims survive.

## D.     The Breach Of Fiduciary Duty Claim Against Oak Hill

Count II of the Complaint asserts that Oak Hill breached its fiduciary duties as a controlling stockholder by "directing its employee appointed directors on ODN's Board to liquidate its investment in the Company" and "accept[ing] redemption payments totaling $85 million when it knew . . . that, if any legally available funds existed, they were a result of the Defendants' prior inequitable conduct." Compl. ¶ 131. This count states a claim.

"[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede*, 634 A.2d at 361. The allegations of the Compliant support a reasonable inference that Oak Hill used its power as a controlling stockholder to cause the Company to sell assets and stockpile cash so that funds would be available when the Redemption Right ripened, when a loyal fiduciary would have deployed those funds for the benefit of the Company and its residual claimants. Through the Redemption Right, Oak Hill was able to extract the cash to the exclusion of the Company's other stockholders, thereby receiving a non-ratable benefit. *See, e.g. Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *Primedia*, 910 A.2d at 260-61.

The defendants argue that the Complaint fails to state a claim against Oak Hill because it "pleads no specifics about what directives—if any—Oak Hill gave, what actions

it took to implement this purported strategy, or what conduct it engaged in, other than exercising its contractual rights to redemption." Dkt. 41 at 35. The Oak Hill entities are "artificial being[s], invisible, intangible, and existing only in contemplation of law." *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat) 518, 636 (1819). They cannot give directives, take actions, or engage in conduct. "A corporation only can act through human agents." *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 60 (Del. Ch. 2015).

The Oak Hill Directors were agents and employees of Oak Hill; they acted on Oak Hill's behalf. The Complaint supports a reasonable inference that they presided over a process designed to maximize the value of the Redemption Right for Oak Hill's benefit, rather than seeking to maximize the value of the Company for the benefit of its residual claimants. Their actions can be attributed to Oak Hill. *See Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *17 (Del. Ch. Aug. 28, 2012).

Oak Hill also claims that its fiduciary duties do not require self-sacrifice for the benefit of the minority stockholders. That is correct, but the Complaint does not contend that Oak Hill should have engaged in self-sacrifice. The Complaint contends that Oak Hill selfishly used its power over the Company to extract *more* than Oak Hill could have been obtained if loyal fiduciaries had been managing the Company's affairs. The Complaint alleges that loyal fiduciaries would have recognized that the Company only had an obligation to redeem the Preferred Stock out of legally available funds and that the Board could have relied on that limited obligation to redeem Oak Hill's shares slowly over time, while managing the Company's business for the benefit of the common stockholders. Loyal directors would have taken advantage of Oak Hill's weak contractual position and used the

86

capital that Oak Hill committed to the enterprise for the benefit of the Company and its undifferentiated equity. Oak Hill instead intervened and used its power over the Company, its directors, and officers to cause the Company to engage in a *de facto* liquidation that made available $85 million in cash that Oak Hill otherwise could not have accessed. The claim is not that Oak Hill had to engage in self-sacrifice; the claim is that Oak Hill engaged in disloyal self-help.

Neither of the cases on which Oak Hill relies supports a different conclusion. In *Synthes*, a controlling stockholder caused the company to enter into a transaction in which the controller and the minority stockholders received the same consideration for their shares. *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022 (Del. Ch. 2012) (Strine, C.). The controller rejected an offer that would have cashed out the minority stockholders for a higher price, but left the controller as an investor in the post-transaction entity. *Id.* at 1039. The plaintiffs alleged that the controller acted disloyally by rejecting the offer that would have generated more cash for the minority investors. Chief Justice Strine, then serving as Chancellor, explained that a controlling stockholder's "duty to put the 'best interests of the corporation and its shareholders' above 'any interest not shared by the stockholders' generally does not mean that the controller has to subrogate his own interests so that the minority stockholders can get the deal that they want." *Id.* at 1040 (quoting *Cede*, 634 A.2d at 361). "Put simply, minority stockholders are not entitled to get a deal on better terms tha[n] what is being offered to the controller[.]" *Id.* at 1041.

This case is the opposite of *Synthes*. There, the controller secured a transaction that gave the minority the same ratable consideration as the controller. Here, the controller

87

caused the Company to sell assets and stockpile cash that the controller could extract through a contract right that otherwise would not have generated similar returns. By doing so, the controller extracted a non-ratable benefit. A loyal board, by contrast, would not have stockpiled funds, resulting in smaller redemptions for the controller in the short-term, less total value for the controller over time, and greater long-term value for the residual claimants. Oak Hill's strategic timing of a stock redemption for its personal benefit "could be a breach of a fiduciary duty," and that ruling is not "inconsistent with the principle that a controlling stockholder has no duty of self-sacrifice, as the defendants argue." *Sugarman*, 1997 WL 162175, at *2.

*Solomon* also does not help Oak Hill. That case involved a controlling stockholder that was *a secured creditor* with the legal right to foreclose on stock owned by the company. *See Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995) (Allen, C.), *aff'd* 672 A.2d 35 (Del. 1996). Chancellor Allen ruled that "[e]ven if the consequences of that foreclosure were . . . to render the value of the minority . . . stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor." *Id.* As this opinion has explained, Oak Hill was not a secured creditor. Oak Hill had no right to foreclose on the Company's assets if the Company could not fully redeem its Preferred Stock. The defendants' reliance on *Solomon* reinforces the inference that Oak Hill perceived itself to be secured creditor, thought it was entitled to payment no matter the consequences for the undifferentiated equity, and acted accordingly. That was a breach of the duty of loyalty.

**E.     The Claim For Aiding and Abetting**

Count III of the Complaint alleges in the alternative that Oak Hill is liable for aiding and abetting breaches of fiduciary duty. This count states a claim.

Generally speaking, "[i]f a defendant has acted in a fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting." *Quadrant Structured Prods. v. Vertin*, 102 A.3d 155, 203-04 (Del. Ch. 2014). A plaintiff may proceed on both claims if it is disputed whether the defendant acted in a fiduciary capacity. *See Calesa Assocs., L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *13 (Del. Ch. Feb. 29, 2016). It seems highly likely that Oak Hill acted in a fiduciary capacity, but Oak Hill has not conceded the point, so it remains conceivable that the aiding and abetting claim could serve a purpose. *Quadrant*, 102 A.3d at 203-04; *cf. OTK Assocs. v. Friedman*, 85 A.3d 696, 719-20 (Del. Ch. 2014) (noting that allegations of complaint could support theory that alleged controller acted as fiduciary and breached its duties, or controller might demonstrate that it sufficiently disabled itself and acted solely as a third party).

A claim for aiding and abetting has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). The analysis of the claims against the directors and officers satisfies all of the elements except knowing participation. In this case, the same factual allegations that support an inference that Oak Hill knowingly breached its duty of loyalty support a similar inference that Oak Hill knowingly participated in the individual defendants' breaches of duty. Count IV therefore survives the motion to dismiss.

**F. The Waste Claim**

Count IV of the Complaint asserts a claim for waste. For a waste claim to survive a motion to dismiss, a plaintiff must show "economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms*." Sample*, 914 A.2d at 670. "The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties . . . ." *Huizenga*, 751 A.2d at 892.

While every act of waste supports an inference of bad faith, every act committed in bad faith does not necessarily constitute waste. "For example, if a director acts in bad faith (for whatever reason), but the transaction is one in which a business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration, the transaction would not constitute waste." *Disney I*, 907 A.2d at 749. "A claim of waste will arise only in the rare, unconscionable case where directors irrationally squander or give away corporate assets." *Disney II*, 906 A.2d at 74 (internal quotations omitted).

The allegations in this case do not satisfy the test for waste. While it is reasonably conceivable that the defendants acted in bad faith by selling the Company's assets for Oak Hill's benefit, the Company received significant consideration in those transactions. In the 2012 divestiture of two of its business lines, the Company received $15.4 million. In the 2013 sale of its Domain Monetization business, the Company received $40 million. And in the 2015 sale of Shopwiki, the Company received $600,000. These prices are not so one-

90

sided to support a reasonable inference that the defendants irrationally squandered the Company's assets. The motion to dismiss Count V is granted.

## G.     The Unjust Enrichment Claim

Count VI of the Complaint asserts a claim for unjust enrichment against Oak Hill, Domeyer, Murray, Greene, and Kupietzky. Each of these defendants received payments as a result of the redemptions of Preferred Stock. Oak Hill received funds directly in exchange for its Preferred Stock, and the others defendants received bonuses. The Complaint asserts that these payments were unjust based on the other theories in the Complaint. This count states a claim.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988) (internal quotations omitted). "The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). As its name implies, unjust enrichment is a flexible doctrine that a court can deploy to avoid injustice.

It is unlikely that Domeyer, Murray, Greene, and Kupietzky could be liable for unjust enrichment under circumstances when they would not also be liable for breach of fiduciary duty. It is possible, however, that the officers might have a defense to liability, and yet the bonuses still could have resulted from a fiduciary breach. Under those circumstances, the officers would have been enriched and the corporation impoverished, a

91

direct relationship between the two would exist, and there would be an absence of justification for the payments. As between the Company and the officers, and depending on the facts, it is reasonably conceivable that the officers could be required to return some or all of the bonuses to the Company. Under those circumstances, unjust enrichment could provide a vehicle for the Company's recovery. *See In re Healthsouth Corp. S'holders Litig.*, 845 A.2d 1096, 1105-06 (Del. Ch. 2003) (Strine, V.C.) (applying unjust enrichment as basis for rescinding repurchase of shares from executive). This scenario seems most likely for Kupietzky, who had the least involvement in the redemption process.

The same reasoning applies to Oak Hill. It seems unlikely that Oak Hill could be liable for unjust enrichment and yet not for breach of fiduciary duty, but it might be possible if Oak Hill could show that it never acted in a fiduciary capacity and did not aid or abet a fiduciary breach. Under those circumstances, if the plaintiff proved that the redemption payments resulted from breaches of duty, then unjust enrichment could provide a vehicle for the Company to claw back some or all of them from Oak Hill.

## H. Laches

The defendants claim that the Complaint is barred by the doctrine of laches to the extent that they challenge actions occurring before March 15, 2013. "[A]ffirmative defenses, such as laches, are not ordinarily well-suited for treatment on [a Rule 12(b)(6) motion to dismiss]." *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009). "Unless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it, dismissal of the complaint based upon an affirmative defense is inappropriate." *Id.* at 183-84. Laches can be applied at the pleadings stage only if "the

92

complaint itself alleges facts that show that the complaint is filed too late. . . ." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993) (Allen, C.).

"[T]he limitations of actions applicable in a court of law are not controlling in equity." *Spazio*, 970 A.2d at 183. Nevertheless, because equity generally follows the law, "a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches." *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009). The analogous limitations period for the claims in this case is three years. *See* 10 *Del. C.* § 8106; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

"If there is a continuing wrong, the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitation period." *Kerns v. Dukes*, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004). To plead a continuing wrong, the plaintiff must allege that the various acts are "so inexorably intertwined that there is but one continuing wrong." *Ewing v. Beck*, 520 A.2d 653, 662 (Del. 1987). "Where a continuing wrong acts as an answer to the defense of limitations it is typically the case that plaintiff can prove her claim by reference only to actions within the limitations period." *Seaboard*, 625 A.2d at 271.

The Complaint supports a reasonable inference that, beginning in 2011 and continuing into 2015, the defendants engaged in an ongoing scheme to maximize the value of Oak Hill's contractual Redemption Right. The Complaint therefore supports a reasonable inference that the defendants' actions outside the limitations period were all "inexorably intertwined" with the redemptions that eventually occurred. Under this theory,

93

the plaintiff could not assert a claim until the Company made the March Redemption and could not challenge the defendant's conduct in its entirety until after the September Redemption. *See Kaufman v. Albin*, 447 A.2d 761, 763-64 (Del. Ch. 1982) ("If a right of action depends upon some contingency . . . the cause of action does not accrue . . . until that contingency occurs . . . .").

The plaintiff moved deliberately to obtain books and records and commence litigation. He filed the Complaint on March 15, 2016. It is not barred by laches.

### III. RULE 23.1 ANALYSIS

The defendants have moved to dismiss two limited aspects of the Complaint pursuant to Rule 23.1 for failing to plead that demand was made or to support a reasonable inference that demand was futile. They argue that the plaintiff's breach of fiduciary duty claims should be dismissed for failure to make a pre-suit demand on the Board to the extent that those claims challenge (i) the January 2012 sale of the Domain Aftermarket Services and Domain Registrar Services businesses, and (ii) the April 2014 sale of the Domain Monetization Services business. This narrow motion is denied.

Demand is futile when "the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

When the Complaint was filed, the Board comprised five members: Pade, Scott, Domeyer, Morgan, and Jarus. As explained above, Pade and Scott are dual fiduciaries who also owe duties to Oak Hill. *See Weinberger*, 701 A.2d at 710. Domeyer is the CEO of the

94

Company, which Oak Hill controls. *Pincus*, 152 A.3d at 128. She also received a personal benefit from the redemptions. These three directors accordingly cannot exercise independent and disinterested business judgment when considering a litigation demand regarding transactions related to the redemption payments. Because the Board lacked an independent and disinterested majority, it is not necessary to consider whether Morgan or Jarus could consider a demand.

The defendants assert that the sales of the Company's three major lines of business were "independent business decisions" that were unrelated to Oak Hill's Redemption Right. The defendants say that any taint related to the redemptions that might otherwise affect Pade, Scott, or Domeyer therefore cannot disqualify them for purposes of the decisions to sell the business. The particularized allegations of the Complaint support a reasonable inference the directors made these decisions to generate an otherwise unavailable pool of cash that Oak Hill could extract using its Redemption Right. The Complaint supports a reasonable inference that the decisions were related.

The Complaint sufficiently alleges that the Board lacked a disinterested and independent majority that could have considered a litigation demand. The narrow Rule 23.1 motion is denied.

## IV.    CONCLUSION

The motions to dismiss are granted as to Count IV, which asserts a claim of waste, and Count V, which asserts a claim for unlawful redemption. The motions are also granted as to Pourzanjani. Otherwise, the motions are denied.

95